[Civ. No. 7867. Second Appellate District, Division Two.—July 28, 1933.]

RICHARD O. WARNKE, a Minor, etc., Appellant, v. GRIFFITH COMPANY (a Corporation) et al., Respondents.

Nimmo, Leighton & Heath and Mark A. Hall for Appellant.

Finlayson, Bennett & Morrow, Henry L. Knoop, Penn Cummings and David D. Stuart for Respondents.

ARCHBALD, J., *pro tem.*—From a judgment in favor of defendants in an action for personal injuries plaintiff has appealed.

For convenience of description we shall assume that near the scene of the accident involved here East Fourth Street in the city of Los Angeles runs east and west and the intersecting streets run north and south. Merrick Street intersects it at right angles from the north, but does not extend beyond it. About one city block west of this intersection Hewitt Street comes into Fourth from the south. The city of Los Angeles, at the time in question, was improving East Fourth Street, which was originally 40 feet wide, by acquiring a strip 20 feet wide on the north side thereof between said intersecting streets. Defendant Griffith Company had the contract for the construction of gutters, new curb and paving. At the time of the accident the old curbing had been removed along the old north line of Fourth Street and header boards had been set in its place, which rose from six to eight inches above the ground level and acted as retainers for the fresh concrete. A curb had been constructed along the new north line of the street to within from 100 to 200 feet of Merrick Street, and forms had been set or were being set for the rest of the new curb and gutters. Along the south edge of the strip, about one foot north of where the old curbing had been, there was a row of electric light poles which carried wires belonging to the bureau of power and light of the city of Los Angeles and others belonging to the Los Angeles Gas & Electric Corporation. A row of new

poles had been set just north of the strip, outside the new curb line, and it was necessary to dismantle and remove the old poles, one of which stood near the place which had formerly been the northwest corner of Fourth and Merrick, designated on the map introduced in evidence as "old pole No. 1", and another west of old pole No. 1 about 120 feet, designated as "old pole No. 2". This dismantling and removal was being done under an order of the bureau of power and light, which authorized a joint pole agreement for such work. This work of dismantling and removal was being carried on at the time of the accident by about fifty employees of the bureau of power and light and the electric corporation.

Plaintiff was an employee of the Los Angeles Gas & Electric Corporation as helper to the linemen. His duty required him to remain on the ground near the pole on which the linemen were working and assist them by raising and lowering materials or tools by means of a pulley and hand line suspended from a crossbeam of the pole. At the time of the accident two of the linemen were engaged in dismantling old pole No. 1, and plaintiff, was assisting them. At the same time defendant company was engaged in paving the 20-foot strip and had already laid the pavement thereon from the westerly end of the strip to within approximately 215.4 feet west of Merrick Street. This operation had for some time required the trucks carrying materials to the concrete mixer from the company's plant at Ninth Street and the Los Angeles River to back into the strip from Merrick Street, in order to dump their loads at the mixer. On the day of the accident there were eight trucks being so employed and they followed each other in regular order, one coming out over the strip as another was backing in. All of the trucks were of about the same design and size. None of them belonged to the Griffith Company, but were engaged by it to do such hauling at an agreed price per load. The above-mentioned forms and their braces extended some two and one-half feet into the strip from the new curbing. At the northwest corner of Merrick and Fourth Streets there was a small pile of lumber next to the forms, and a carpenter, Fred Felix, was working on the forms. This forced the trucks to enter the strip from Merrick Street at some distance from the new curb, and the evidence shows that they followed one route, marked by ruts

made in the soft dirt over which they traveled. Just prior to the accident plaintiff had been called by one of the linemen on old pole No. 1 to lower some materials, and he took his position, standing north of the handline and from two to three feet from the pole. The line was hanging from twelve to eighteen inches due north of the pole. Plaintiff stood looking up the pole, watching the lineman tie a fusebox onto the handline, waiting for that to be done so he could lower it to the ground. While so standing defendant Marrett backed his truck, loaded for the mixer, into the east end of the strip. The right rear corner of the truck struck plaintiff, knocking him headlong to the ground. The right rear double wheels pinned his foot down, and the backing vehicle ran up plaintiff's legs and onto his pelvis, severely injuring him. Marrett was then warned by someone, and immediately drove the truck forward and off the injured man's legs.

Appellant concedes that if the case had been submitted to the jury under what he terms ''proper instructions'' the evidence would support the verdict; and also that if proper instructions had been given the jury would have been justified in implied findings that plaintiff's injuries were caused by the negligence of both defendants and that plaintiff was not guilty of contributory negligence, and that the jury would most probably have so found. He contends, however, that the court erred (1) in giving instructions regarding the question of whether Marrett was an employee of Griffith Company or an independent contractor; (2) in instructing the jury that plaintiff was a mere licensee; (3) in giving and refusing instructions relative to plaintiff's alleged contributory negligence, his rights and duties as a workman and the *quantum* of care required of him; (4) in instructions concerning the relative amount of care required of plaintiff and defendants; and (5) in excluding certain evidence and permitting the introduction of other evidence, overruling certain objections to evidence and denying motions to strike same, and in refusing as well as in giving certain other instructions. In view of the conclusion reached we shall leave the discussion of the first contention until the last.

Marrett's truck was so constructed that he could not see anyone of ordinary stature for some distance directly back of it, either by looking around the left side where he sat or

through the window at the back of the cab, much less anyone back of the opposite rear corner of the vehicle, which struck plaintiff. There were but six of the fifty utility employees about the job directly engaged, as was appellant and the two linemen working with him, making but two "ground men" and four "linemen". It does not appear from the evidence that the second "ground man", who was working at old pole No. 2 while appellant was working at old pole No. 1, at any time stood in the strip over which the trucks were constantly passing. At this distance (at least 120 feet) he heard the lineman shout to appellant, "Get on the hand line". Respondent Marrett knew that the utility men were working around the job but did not see appellant in the strip before he backed. Likewise appellant knew the trucks were backing into the strip and passing out, and had already seen "not more than six or eight trucks in all" back past him before he was hurt. The latter testified that before he stepped onto the strip he looked toward Merrick Street but did not see any trucks. Attorneys for defendants have united in filing a joint brief for both respondents, as most of the exceptions involve them mutually.

■ (2) We see no error prejudicial to appellant in the giving of the instructions here complained of. The court did not say that plaintiff was a "mere licensee". After advising the jury by the instruction that plaintiff "had a legal right to be on the premises where he was performing his work", the court said (italics ours): "However, so far as the defendant Griffith Company was concerned, the plaintiff was a mere licensee; *that is, the defendant Griffith Company was not required to provide a safe place for him to work.*" The court neither in this nor any other instruction we find defines what the words "mere licensee" mean, nor did it say what the duty of the Griffith Company was to "a mere licensee, as compared with an invitee". The only thing the jury could have understood by the use of the words in the instruction was that the Griffith Company was not required to provide plaintiff with a safe place to work. Appellant was not an employee of the defendant Griffith Company, nor was he performing any work for them. He was working solely in the interest of his employer, the Los Angeles Gas and Electric Corporation, which had an equal

right with the Griffith Company, though a different job to do, upon the premises—which belonged to the public, although the public was excluded from their general use while the improvement was under way. ■ In the same instruction the court did tell the jury that "it was the duty of the defendant Griffith Company to refrain from committing any overt act of negligence in connection with its direction and control of the manner and place in which the trucks were necessarily required to pass", that "If, therefore, you conclude that in the exercise of such reasonable prudence and care, under all of the conditions as they appear to have existed in connection with the backing of the trucks, taking into consideration the difficulty, if not impossibility, of the drivers of the trucks to see in the rear and both sides of the trucks as they backed in, and taking into consideration the further fact that workmen were working along and near the path of the moving trucks, the Griffith Company should have maintained a flagman or other means of notifying the workmen of the approach of each truck, then the defendant Griffith Company was guilty of negligence." In our opinion the instruction given is as favorable as appellant could have asked, even assuming he was an invitee. Even an invitee assumes all obvious dangers on the premises he is invited to enter. (*Shanley* v. *American Olive Co.*, 185 Cal. 552 [197 Pac. 793].) In view of the last sentence of the instruction, which we have quoted, the jury could not conclude from the statement made (of which appellant does not complain) that it was the duty of the Griffith Company to refrain from committing "overt" acts of negligence in connection with the use of its trucks; nor in view thereof could the jury infer from such last statement that the Griffith Company would be liable only for such "overt" acts. ■ Other instructions given show that the case was presented to the jury, not upon the question of the degree of care due a "mere licensee", but liability based upon the failure of such company to exercise ordinary care in carrying on its operations, which we are of the opinion is the true measure of its liability.

(3) Appellant urges that there was only one place he could stand and do his work, and also, evidently, that he was required at all times to keep his eyes on the linemen; that he was not bound to neglect his work in order to main-

tain a constant lookout for approaching danger; that he was not bound to assume the risk caused by the negligent use by others of instrumentalities likely to cause him injury, and that he had a right to presume that such others would not run him down without warning; that such being the law, the court erred in instructing the jury (a) that he was required "constantly" and "at all times" to keep on the lookout for approaching danger, (b) that he assumed the risks from the negligent operation of dangerous instrumentalities at the place where he was working, and (c) in refusing to instruct the jury that he had a right to presume that dangerous instrumentalities would not injure him without warning.

▋ (c) At the request of plaintiff the court in substance instructed the jury that there is a difference between the amount of care required of a pedestrian who might enter premises where there is danger of being injured by motor vehicles or other instrumentalities and that required of a workman forced to be upon the premises in performance of his duties—"not that the workman is bound to exercise any lesser degree of care, but because the care to be exercised must be determined from a different standpoint"—and that what might be negligence on the part of a pedestrian or stranger might be due care on the part of the workman; that in both cases the parties are required to exercise ordinary care and to use their senses before entering upon a place of danger, "but that the duty which devolves upon the pedestrian or stranger to continue to exercise his sense of sight does not devolve with the same strictness upon the workman. The workman is not called upon to exercise the same amount of diligence in avoiding accidents as pedestrians or others who use the same place merely as a medium of locomotion . . . " The court refused to give as a part of such instruction the further statement that such workman was not bound to neglect his work in order to avoid an injury which might be caused by want of ordinary care on the part of operators of vehicles, but has a right "to assume that other persons will exercise due care for his safety", "that dangerous instrumentalities will not be thrust upon him without warning", and that "it should not necessarily be said that he contributes to his own injuries by doing that which his employment required him to do",

We are of the opinion that under the testimony of appellant himself there was no place in the instructions for the portions thereof refused. He testified that the trucks backed in on an average of one every four or five minutes; he must have known from observation that the driver operating the truck in question could not see anyone standing by the pole; he knew he was standing in the depression made in the dirt by the truck wheels. Knowing all that, he testified that just before the accident he was standing 8 or 10 feet west of the pole; that he heard one of the linemen "holler" to him and he "walked in a northeasterly direction toward where the hand line was hanging, just north of the pole. As I walked forward, I looked ahead of me to see if any trucks were ready to back in. I could see clear across Merrick street. There was no truck approaching or backing in. The hand line was hanging about 15 inches north of the pole. I took my position just north of the hand line, and faced to the south, with the hand line between me and the pole. I was standing about 2 feet or 2½ feet north of the pole. I looked up the pole to see what the lineman wanted, and I saw Mr. Bolton tying a fuse-box, or birdcage, onto the hand line. *I stood looking up at him, watching to see when he would have it tied on so that I could lower it. I stood there about a minute while he was tying it on; all that time I was looking up at him, and during that time I did not look to the east to see if any trucks were backing in. I did not change my position during that time. Mr. Bolton hollered for me to lower the bird cage, and I was just reaching for the hand line* when I felt something hit me on the rear portion of my left side". Appellant could just as well have watched the lineman tying the load on the line from a safe position. He was certainly not performing any part of the duty required of him by watching the lineman perform his duty, and if he had glanced occasionally in the direction from which danger approached him, until the lineman gave the signal to lower the fuse-box which it is evident he was waiting for, the deplorable accident could not have happened. In our opinion the only instructions warranted under the circumstances shown by plaintiff's own evidence were those given by the court. It is true there was evidence that the line had to hang where it was on the pole and that the lineman placed it, and not appellant; but the

only reason shown by the evidence as to why appellant had to stand where he did instead of closer to the pole is "because if I had done so I would have been in danger from something falling down the pole. Sometimes the linemen drop things out of their hands, or drop pliers or other things out of their belts" and "you have to stand with your face to the pole in order to control the hand line and keep the materials on the line from swinging in toward the pole". It is evident from appellant's own testimony that he was not yet operating the hand line when struck, but was simply waiting for the load to be tied on and the signal given; and even though plaintiff testified that he was "looking up the pole to see when the lineman was ready for him to lower", it is evident from his own testimony that it was an audible signal that he was waiting for and upon the giving of which he reached for the line.

▉ (a) The court instructed the jury to the effect that defendant Marrett had a right to back his truck over the strip of ground and that such right was equal in every respect to the right of appellant to be where he was at the time of the accident, that just as their rights were equal, so also was the duty of each to exercise ordinary care under all the circumstances, and that "plaintiff could not assume or act or rely upon the assumption that he would not be injured" by a truck passing by the place when he was working, "but that he was required to keep such a lookout for such trucks as under similar circumstances an ordinarily prudent person would have kept for his own safety and protection". Appellant urges that under the case of *Egan* v. *Southern Pac. Co.*, 15 Cal. App. 766 [115 Pac. 939, 940], and *Jones* v. *Southern Pac. Co.*, 74 Cal. App. 10 [239 Pac. 429], he had a right to assume the very thing the court instructed the jury he could not. In the case of *Egan* v. *Southern Pac. Co., supra,* an employee of the railroad was struck by a string of cars which passed him on the way up grade and after switching a car apparently remained motionless on the track, with no one in sight except the fireman, "who was sitting in the cab door with his feet upon the steps". Seeing this, the plaintiff resumed his work upon the track, and while so engaged was struck by the cars, which "without any warning or signal, backed down the track, and by reason of the grade no indication of their approach was

observed by plaintiff''. The court there said that plaintiff had a right to assume that the train would not be backed down upon him without warning, and that it should not be said that he contributed to his own injury in the doing of that which his employment required that he should do. The verdict in that case was in plaintiff's favor, and it was one of the contentions of appellant that contributory negligence was shown on the part of plaintiff. That the court did not intend the statement made should be used as an instruction to the jury under the facts of this case is clear not only from the great difference in the facts of the two cases, but from the use of the following language, which would seem to be applicable to the facts here, viz.: ''It cannot be disputed that one familiar with the dangers connected with an employment as a general rule assumes the risk incident thereto.'' Plaintiff in the instant case testified that he ''knew it was a dangerous place.'' There is testimony that the noise made by the trucks in backing the heavy load was greater than would be made by a horn. Mr. Ward, the other ground man, who was working at the time at old pole No. 2, at least 120 feet closer to the mixer, testified that when the mixer was 100 feet away the truck could be heard at a distance of 25 feet. The statement we have quoted from *Egan* v. *Southern Pac. Co., supra,* approves the principle of law criticised in the instruction given and which we think is peculiarly applicable to the facts of this case. In the Jones case, *supra,* the deceased was an employee of an independent corporation which had been requested by defendant to make necessary repairs on defendant's tracks, and as in the Jones case the statement was in the nature of an argument by the court showing that under the facts of that case plaintiff was not guilty of contributory negligence as a matter of law, but that such question was one of fact properly submitted to the jury. In view of what we have said, we see no error in the instruction complained of in appellant's ninth specification of error.

█ Nor do we see any error in the instructions given to the effect that if the jury found that the noise of the concrete mixer affected appellant's ability to hear the trucks as they were backing up, ''then I instruct you that the plaintiff was bound to use a greater amount of care for his own safety and protection and to be more vigilant in look-

ing than if his hearing were not so affected''. The amount of care varies with the circumstances surrounding a party. While the test which determines negligence or lack of it is the conduct of an ordinarily prudent person under the same or similar circumstances, necessarily the amount of such care varies with the differences in such circumstances. This instruction but calls the attention of the jury to the fact, which is a commonplace, that if the circumstance of excessive noise is present, alertness to danger must increase; that is, the amount of care must be greater in order that the common measuring stick of ordinary care may be applied.

The court also instructed the jury that ''it was the duty of plaintiff to exercise his faculties of sight and hearing to apprise himself of danger, if any, and to use ordinary care at all times in exercising his senses of sight and hearing. To look in a careless manner or to listen in a careless manner is not to look or listen at all.'' To the first part of such instruction appellant urges that it was error to instruct the jury that ''it was plaintiff's duty to exercise his senses of sight and hearing *at all times* to apprise himself of danger''. We do not believe that construction can be placed on the language used by the court. That it was appellant's duty to exercise such faculties for such purpose and to use ordinary care at all times in such exercise could hardly be questioned, and that is all the court said. The only objection made to the last phrase of the instruction is that there is ''no evidence at all that plaintiff looked or listened 'in a careless manner' or that he did not 'look or listen at all' ''. In our opinion there is ample evidence to support either conclusion on the part of the jury.

(b) The court gave three instructions designated as C, E and G, respectively, of which appellant complains in his thirteenth, fourteenth and seventeenth specifications of error. The general ground of such objection is that the court failed to apply the law applicable to workmen bound to carry on their employment in a place of danger. We have already shown that in our opinion such contention is not good under the evidence in this case. The instructions properly state the law applicable to this case. Instruction E says in part: ''Each [referring to plaintiff and defendants] in turn assumed the ordinary risks involved in being upon and moving over ground where others were occupied

in working and handling or moving objects that might cause injury''; and we fail to see anything in such language which the jury could construe as meaning that appellant assumed the risks of respondents' negligence, as urged, particularly in view of all the instructions given by the court. The same objection is made as to instruction G, wherein the court said: ''The plaintiff went upon the premises and assumed all of the ordinary and reasonable risks of the dangers involved in the general conditions as they existed there, as they were apparent or should have been apparent to him.'' Even if such a construction could be placed thereon by the jury, we are of the opinion that if it was apparent to appellant that the truck drivers could not see him if he was standing in the ruts made by the vehicles' wheels as they were backing into the strip (and it would seem to be plainly apparent to anyone), such negligence in so backing might very well be one of the ordinary dangers involved, and if appellant failed to use ordinary care in performing his duties as the court otherwise instructed, he might well be said to have ''assumed'' the risks of such negligence.

 In his eighteenth and nineteenth specifications of error appellant attacks the following instruction as not properly stating the law relating to workmen and in calling for constant vigilance and watchfulness on the part of one in a position of constant danger: ''While the plaintiff was only required to exercise ordinary care for his own safety and protection, nevertheless the amount of that care which he was required to exercise must be measured by the extent of his exposure to danger. A person who is in a position of danger must exercise care proportionate to the danger; he must be as vigilant and watchful as the danger of his position requires. If he is in a position of constant danger he must be constantly vigilant and watchful. He must exercise such amount of care which an ordinarily prudent person in a like position of danger would exercise for his own safety and protection. Therefore, if you find that at and immediately prior to the accident the plaintiff was in a position of danger and that he failed to exercise an amount of care commensurate with such danger, then he was negligent, and if you further find that such negligence proximately caused or contributed to the accident and injuries he cannot re-

cover, and in such event your verdict should be in favor of both defendants."

In the case of *Kenna* v. *Central Pac. R. R. Co.*, 101 Cal. 26 [35 Pac. 332, 333], plaintiff's intestate was employed by defendant as a plumber in fitting and connecting pipes alongside its tracks in the construction of a signal tower, and while walking upon the end of the ties on the outer tracks from the tower to his work bench, for the purpose of cutting a piece of pipe, the deceased was struck in the back by a locomotive and killed. Defendant's motion for a nonsuit was granted. The Supreme Court said, in affirming the judgment of nonsuit: "It may be assumed, however, that the defendant was guilty of negligence to such a degree that in the absence of any other evidence it would be liable in damages, but the contributory negligence of the deceased was, nevertheless, such as to prevent a recovery against the defendant. It appears from the evidence that Fallon was a prudent, cautious man, twenty-two years old; that he knew the danger of the place in which he was working; had talked with his uncle about it; had had the experience of several days in which to learn the frequency with which the trains passed over the track, and to become acquainted with the danger; and that owing to the curve in the track and the obstruction caused by the tower, he could not see an approaching train until it came within a few rods of him. It was therefore incumbent on him to exercise a corresponding care and vigilance to avoid danger, rather than negligently and recklessly expose himself to injury. 'His employment and the theater of his services may not be disregarded. They made him conversant with the locality, the character and frequency of trains, the necessity for incessant vigilance to avoid injury, and the fact that no one could venture upon the tracks and escape injury without the greatest circumspection.' (*Bresnahan* v. *Railroad Co.*, 49 Mich. 413 [13 N. W. 797].) The law demands that one who is working in a place where he is exposed to danger shall himself exercise his faculties for his own protection, and does not permit a recovery for damages resulting from a neglect of this rule." The court there held plaintiff negligent as a matter of law. Here the trial court left the question to the jury, and in our opinion but one conclusion could be reached under the facts presented, and we think the court properly

advised the jury as to the law applicable. "The care required must be in proportion to the danger to be avoided and the consequences that might reasonably be anticipated from the neglect. The greater the risk of danger the greater must be the care. What is ordinary care in the case of extraordinary danger would be extraordinary care in a case of ordinary danger." (29 Cyc. 428, 429, quoted with approval in *Hatzakorzian* v. *Rucker-Fuller Desk Co.,* 197 Cal. 82, 98 [239 Pac. 709, 41 A. L. R. 1027].) See, also, *Ramos* v. *Service Brothers,* 118 Cal. App. 432 [5 Pac. (2d) 623], wherein plaintiff, *an experienced road worker,* was ordered by his employer to remove some oil which had leaked on the road (these last facts appear only in the transcript) and was struck by a backing truck.

 (4) The court refused to give a very long instruction requested by plaintiff which in part charged, so far as the driver of the truck was concerned, that while both plaintiff and defendant Marrett were charged with the same degree of care, "the amount of care exacted of the driver of a motor vehicle is far greater than the amount of care exacted of the foot-passenger. The driver of a motor vehicle—a dangerous instrumentality capable of inflicting fatal injuries—is charged with a greater amount of care than the pedestrian." Another phase of the same instruction combined the two defendants and instructed the jury that if it should find "that the truck which Mr. Marrett was driving, and the operations which the Griffith Company was carrying on, were dangerous instrumentalities, and that they were more likely to injure the plaintiff than he was to injure them . . . , that in order to exercise the same degree of care" defendants were required to exercise a greater amount than plaintiff, and if the jury found that "they failed to exercise the degree of care required of them, and that plaintiff did exercise the degree of care required of him", that then they should find for the plaintiff. The particular part of the instruction above referred to is urged to have been erroneously refused.

The court did instruct the jury that "all persons must exercise ordinary care when their conduct may affect any other person, or when they may be affected by the conduct of any other person", and that "it is as much the duty of a person to exercise ordinary care for his own safety and

protection as it is his duty to exercise ordinary care with respect to the safety and protection of others''; and then applying such instructions to the case on trial the court said: ''It was as much the duty of the plaintiff to exercise ordinary care for his own safety and protection as it was the duty of defendants, or either of them, to exercise such care with respect to the plaintiff's safety and protection.'' In another instruction given the jury was told that Marrett had a right to back his truck over the strip of ground and that such right was equal in every respect to the right of plaintiff to be where he was at the time; that ''just as their rights were equal, so also was the duty of each to exercise ordinary care under all the circumstances equal''. The quoted language is urged as erroneous, just as the language of the instruction previously referred to, in that it informs the jury that plaintiff was required to exercise the same amount of care as defendants, and the same complaint is made of certain language taken from instruction E, heretofore mentioned, which says that the ''obligations of the plaintiff and the defendants were coequal, in a sense, and reciprocal''. We cannot agree with appellant that such is the effect of the instructions when read as a whole. As so read they clearly conform to the rule that each is required to use that degree of care which ordinarily prudent men would exercise under the circumstances in which each found himself; and while it is undoubtedly true that the amount of care required of the driver of the truck was greater than that required of appellant, as set forth in the part of the instruction refused by the court, and while such instruction sets forth a correct principle of law, we are of the opinion that the charges given by the court are equally sound as principles of law. ▮ In addition to being sound, those given afford some help to the jury. The one refused does not. What would a jury get out of the one refused? Nothing but confusion. It seems clear the only hope one might have in proposing it would be that the jury might get the idea that in some way, in the eyes of the law, appellant was in a more favored position than defendants, regardless of the facts. Nor do we think the proposed instruction fair in stating that the truck is a ''dangerous instrumentality''. That language has been used, inadvertently we think, in referring to motor and other vehicles propelled by power.

They are only dangerous, in themselves, in the hands of an incompetent or careless driver. That there is possibility of great danger from them if carelessly operated, or if pedestrians or others are negligent around them, is undoubtedly true, but that of itself is not enough to warrant so classing them in an instruction—which would only seem to have the purpose of inflaming a jury at a helpless and inanimate piece of machinery, with the hope possibly that the feeling would spread to the driver or owner. How would the jury compare the amount of care required of the driver with that required of the pedestrian? Of course, that is impossible. How would it help even if they could do so? It clearly could not. Furthermore, in our opinion, such proposed instruction clearly indicates to the jury that some such comparison is to be made, and it can only be in the final analysis a comparison of negligence, which they were properly instructed by the court they could not make, as appellant admits. Similar instructions have been by different appellate courts approved as not constituting error. This court so held in the case of *Morgan* v. *Los Angeles R. & G. Corp.*, 105 Cal. App. 224 [287 Pac. 152]. We are of the opinion that while such a charge might not be erroneous if given in connection with proper instructions as to the degree of care necessary for each to use to avoid being negligent, still it falls short of being a good instruction in many particulars; and we think the court exercised sound judgment in refusing to give it. We are not unmindful of the fact that the refusal of a similar instruction has been held to be error, in the case of *Vedder* v. *Bireley*, 92 Cal. App. 52 [267 Pac. 724], but with the conclusion reached there as to such instruction we cannot agree.

(5) The drivers of three of the trucks used on the work referred to testified without objection as to the noise made by their machines in backing into the strip and as to conditions generally prevailing as to noises. We see no prejudicial error in permitting three other drivers to testify thereafter, over appellant's objection. The testimony of the last three was practically the same as that of the first three, whose evidence was already in the record. It would seem to be more a matter of weight than competence anyway, considering that it was unquestioned that the trucks were of practically the same size and design and carried about the

same weight and were operated over the same tracks, and that some of them were coming out while others were going in, at least two of them being in close proximity at the time of the accident.

We find no merit in the other miscellaneous errors urged by appellant.

(1) If the jury had found Marrett guilty of negligence and appellant free from contributory negligence, the question of whether or not he was an employee of Griffith Company would have been material. If the jury found him guilty of negligence, but also found appellant guilty of contributory negligence, it would still have had to find for Marrett. In view of the fact that we find no error which prejudiced appellant, we must assume that the jurors found him to have been negligent himself, in which event it would have been immaterial whether he was employed by the Griffith Company or not, or whether one or both of the defendants were negligent. Nor could an instruction leaving the question of employment to the jury have changed the verdict in any respect.

Judgment affirmed.

Works, P. J., and Craig, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 25, 1933.