[Civ. No. 3931. Third Appellate District.—September 11, 1930.]

JOSEPHINE GIOVANNONI, Administratrix, etc., Respondent, v. THE UNION ICE COMPANY (a Corporation) et al., Appellants.

Daniel W. Burbank and Clarence N. Riggins for Appellants.

Nathan F. Coombs for Respondent.

MR. JUSTICE THOMPSON DELIVERED THE OPINION OF THE COURT.—This is an appeal from a judgment rendered upon a verdict for damages for the death of Antonio Lanaro, which occurred as a result of a collision between an ice truck and a motorcycle.

The highway which traversed Alta Heights in east Napa was undergoing repairs. Spring Street, which intersected the highway in that vicinity and extended at a right angle practically east and west, was then used as a detour. In the block adjoining the highway Spring Street ascended to that thoroughfare at approximately a six per cent grade. Spring Street was sixty feet in width between adjoining property lines. Down the center of this street a fifteen-foot strip was covered with loose gravel as a base for road purposes for the use of vehicles. The traveled portion of this graveled strip had been worn to a hard, smooth surface for a space of about eight or nine feet in width. A strip of loose gravel some three feet in width had accumulated along either side of the traveled way. The balance of the street, consisting of dirt, was fairly smooth and passable, but was ordinarily unused along the borders thereof.

On the afternoon of September 9, 1927, Antonio Lanaro, who was the chief means of support of his elderly father, Battista Lanaro, who died subsequent to the trial of this case, was conveying his sister, Gustina, to the home of their married sister, Mrs. Pighini, who lived about the middle of the block on the southerly side of Spring Street. The motorcycle stopped at the southerly edge of the graveled roadway in front of the house. The front wheel rested upon the loose gravel at the edge of the traveled way. The rear wheel rested upon the dirt beyond the gravel. The machine was standing in an upright position at about a

forty-five degree angle to the roadway and headed upgrade in the direction from which Antonio had come. There were no trees or obstacles to prevent an unobstructed view of the entire street in this block. When the motorcycle was brought to a stop in this position Gustina dismounted and walked to the gate in front of their sister's house. This gate was some twelve or fifteen feet distant from where the motorcycle was stationed. Antonio stood by the side of his machine with one leg thrown over the saddle to support it. The evidence does not affirmatively disclose the fact, but it seems apparent that his motor was permitted to run while he stood there. Upon reaching the gate, the sister said, "The gate is locked." Antonio said, "I will come up and unlock it." Gustina replied, "Never mind I will go around to the other one." This she proceeded to do. The conversation lasted only a moment or two. Apparently Antonio then mounted his motorcycle and attempted to return, starting up the grade on the southerly side of the graveled portion of Spring Street. A collision occurred immediately between the motorcycle and the defendant's ice truck which was then coming down Spring Street, resulting in the death of Antonio the following day. Gustina did not see the actual collision and her testimony furnishes little evidence of value concerning the cause of the accident.

As the motorcycle entered Spring Street on its way to the home of Mrs. Pighini, the defendant's truck, weighing 4,500 pounds and containing 1200 pounds of ice, followed, driven by the defendant John McDonald, who was half a block behind the motorcycle. McDonald was an experienced driver and was familiar with the condition of Spring Street, having frequently used it as a detour during the repairing of the highway. His machine was in good condition. The brakes had been inspected shortly before the accident and were not defective. McDonald testified that he knew Antonio and saw him stop his motorcycle while his sister dismounted and that he observed him standing by its side in the position above related. He said he drove the truck down the grade along Spring Street at about twenty miles an hour. All witnesses agree he was not driving at an excessive rate of speed. He admits he neither applied the brakes nor sounded the horn. There appears to have been no occasion for sounding the horn since

Antonio saw him coming. He was following the extreme northerly side of the graveled portion of the roadway inside the strip of loose gravel along the edge. He saw and recognized Antonio as he stood by his motorcycle on the opposite side of the traveled portion of the roadway. When he reached a point about twenty-five feet from the motorcycle, McDonald claims to have greeted Antonio by raising his left hand from the steering-wheel. This salute was acknowledged by Antonio with a smile. Except for the fact that Antonio stood by the side of his motorcycle at the edge of the graveled portion of the roadway, there was nothing in his attitude or conduct to indicate that he intended to immediately mount and run the motorcycle out into the traveled portion of the roadway. He stood in a position of complete safety. If he had remained in that position he would have encountered no danger. It is evident the truck would have safely passed him with an intervening space of about three feet. There is no evidence to the contrary. There are no circumstances to indicate that a reasonable person should have anticipated that the motorcycle would be driven out into the course which the truck was pursuing until it had passed. Mr. McDonald testified: ''I was approaching him. He had his wheel sort of tilted out in the gravel. As I went by, I waved to him, and then I had my hands on the wheel, I was looking straight ahead, and he was just about direct across from me, when I heard the gas from the motorcycle and the crash all come at once. As soon as I heard the crash, I just whipped the truck over to the (right) side of the road and tried to avoid it as much as possible.'' McDonald promptly stopped his truck and found Antonio lying on his back in front of the rear wheel. His body had been dragged several feet. He was seriously injured and was taken in an ambulance to the hospital where he died from the effects of these injuries the following day. The motorcycle was found demolished beneath the truck. It apparently struck the truck midway between the front and rear wheels. An indentation was found upon the driving shaft of the truck where the motorcycle came in contact with it.

Regarding the conduct of Antonio immediately before the accident, Mrs. Mabel Sheridan, a neighbor of Mrs. Pighini, testified that she lived on Spring Street about 150 feet

from the accident. She saw the truck coming down the road twenty-five or thirty miles an hour. She saw Antonio drive his motorcycle down the street and stop in front of his sister's gate. Regarding the approach of the truck, she said: "It was coming down the road. He (Antonio) was turning around and, when it got there, it seemed to me—well, I don't know. . . . Q. Now do you know whether or not Antonio Lanaro started his motorcycle that afternoon to go either up or down the hill before the truck reached him? A. I think he had started. Q. And how far had he traveled . . . ? A. About . . . (six feet) . . . It is rather hard to say whether he was going straight up (hill) or whether he skidded sideways. . . . Q. Had Antonio Lanaro gotten out into the road after he started before the truck arrived at the same place? A. Yes, I think he was in the middle of the road. . . . Q. Did you see the motor bike in motion . . . ? A. Yes, sir, I did. . . . Q. The truck at all times stayed on its right-hand side of the road . . . ? A. I am pretty sure (it did). Q. Did you see the motor bike skid in that gravel? A. I am pretty sure he did skid, or he was turning." Julius Brewer testified: "I looked for the tracks (of the motorcycle) and I seen where the motor bike skidded." Dr. Bulson, who attended the injured man at the hospital, said that "he was suffering from profound shock and some pain." The doctor overheard a conversation between Antonio and the coroner, Theodore Treadway, in which Antonio said, "he ran into the rear end of the truck." Mr. Treadway testified that Antonio told him: "The motorcycle skidded in the loose gravel and he said that he dove right under the machine. 'It was my own fault. I should have waited until the truck got by.' . . . Q. Did you ask him whether or not the truck was going at a high rate of speed? A. Yes . . . he said, 'No, not very.' Q. Did he say anything about the driver, that he didn't stop or anything of that kind? A. No, I asked him if the driver of the truck stopped and he said, 'Yes, he stopped just as quick as he could.' Q. In other words, he didn't blame the driver? A. No, he said, 'It was my own fault.'"

The appellant contends that the evidence discloses an absence of negligence on the part of the defendant; that it shows contributory negligence on the part of the deceased and that the court erred in instructing the jury upon the

doctrine of the last clear chance since there is an entire absence of facts rendering this doctrine applicable to the case.

We are unable to find any substantial evidence in the record to sustain the judgment. Negligence on the part of the driver of the ice truck does not appear. He did nothing and omitted nothing in the operation of the truck inconsistent with the conduct of a reasonable person so far as we are able to observe. He drove his truck under absolute control at a reasonable rate of speed on his proper side of the roadway. He saw and saluted the deceased as he stood by the side of his motorcycle in a place of safety. There is no evidence of conduct on the part of Antonio from which it may be said the truck driver should have anticipated that he intended to drive the motorcycle from its place of safety into the zone of danger. There is no conflict of evidence regarding the fact that the deceased saw the truck approaching when it was but twenty-five feet away and smiled in response to the truck driver's salute.

The driver of a motor vehicle who is operating it in a lawful manner seeing another person occupying a place of safety and observing that he is conscious of the approach of the machine may assume that he will not deliberately leave the place of safety and without warning place himself in a position of danger. The presumption that all persons will exercise due care for their own safety is but a commonplace maxim, the observance upon which one may reasonably rely. We are impelled to hold that the record disclosed no act or omission on the part of the truck driver which constitutes negligence. It therefore becomes necessary to reverse the judgment.

The doctrine of the last clear chance presupposes the negligence of the plaintiff's intestate. It imposes liability for injuries sustained by one even though by his own negligence he is placed in a position of peril from which he is unable to extricate himself or is obviously unconscious of his predicament provided another who has knowledge of his peril and by the exercise of ordinary care is able to avoid the act which causes the injuries, nevertheless fails to do so. (19 Cal. Jur. 651, sec. 80.) In the present case it does not appear that the truck driver had any previous knowledge that the deceased was in danger. Having no

warning of the intention of Antonio to drive his motor-
cycle into a place of danger, the truck driver was unable
to avoid the accident. In the case of *Gimeno* v. *Martin,*
64 Cal. App. 154 [220 Pac. 1076], it is said:

"Immediately before the actual infliction of the injury
plaintiff was in a position of safety on the east side of the
road, . . . In that position he was not in danger, and the
rule of the last clear chance doctrine did not call for any
action on the part of the defendant. When plaintiff sud-
denly darted from his position of safety directly in front
of the automobile, there was no last clear chance for the
defendant to avoid the accident."

This language seems to be peculiarly applicable to the
facts of this case.

 Charging the jury upon the doctrine of the last
clear chance when there is no substantial evidence to sup-
port the theory is reversible error. (*Wallis* v. *Southern
Pac. Co.,* 184 Cal. 662 [15 A. L. R. 117, 195 Pac. 408];
*Giannini* v. *Southern Pac. Co.,* 98 Cal. App. 126, 138 [276
Pac. 618]; *Buttrick* v. *Pacific Elec. Ry. Co.,* 86 Cal. App.
136, 140 [260 Pac. 588].)

Negligence and the application of the doctrine of the
last clear chance are ordinarily questions for the determina-
tion of the jury. Where, however, there is no substantial
evidence in the record to support a judgment which is
founded thereon, it cannot be upheld.

The judgment is reversed.

A petition for a rehearing of this cause was denied by
the District Court of Appeal on October 11, 1930, and a
petition by respondent to have the cause heard in the
Supreme Court, after judgment in the District Court of
Appeal, was denied by the Supreme Court on November
10, 1930.