[Civ. No. 19914. Second Dist., Div. One. May 4, 1954.]

DAVID A. HARGRAVE, Appellant, v. ACME TOOL AND TESTER COMPANY (a Corporation) et al., Respondents.

Russell H. Pray, William C. Price and Joseph A. Capalbo for Appellant.

Ball, Hunt & Hart, Moss Lyon & Dunn, Sidney A. Moss and Henry F. Walker for Respondents.

DRAPEAU, J.—On July 16, 1950, plaintiff was one of a drilling crew employed by Loffland Brothers Company, an oil well drilling contractor. Said company had contracted to drill several wells for Richfield Oil Company. The latter company had a contract with the harbor department of the city of Long Beach to drill and operate numerous wells on city property in the harbor area.

As drilling operations on Well No. A-15 were nearing completion, to wit: a depth of 3,400 feet, it was necessary to conduct a water shut off test in compliance with section 3220 et seq., Public Resources Code. By the terms of its contract, Richfield was required to select the testing company. In this case, it selected defendant Acme Tool and Tester Company, which supplied the testing tools.

Defendant Hale was drilling foreman for Richfield, and defendant Watson was his subforeman or tool pusher. The Loffland drilling crew, working under drilling superintendent Dahlitz, consisted of five men: foreman Morris, derrick man Holcomb, and three floor men or rotary helpers: Steinberg, Chastain and the plaintiff, Hargrave.

In making the water shut off test, it was necessary to attach the testing tool to the bottom of the drill pipe by threading it into the final joint at the lower end of a section of drill pipe, and then lower the tester to the desired depth; in this case, 2,000 feet below the surface.

Both the statute and the rules of Richfield required the use of caps or plugs in drilling wells in the harbor district. They were used in capping the drill pipe at the surface, as the pipe was being raised or pulled out of the well bore or "hole" and disconnected into sections or "stands." Their use was to prevent and protect against pollution and fire hazard, and also for safety of the crew.

Richfield had instructed Loffland to have available, and to use plugs in any operation that might cause a spillage.

In a majority of instances, the company furnishing the testing tools also furnished plugs and chains.

At the appointed time, Acme delivered the testing equipment and brought along two lightweight plugs, weighing about 1½ pounds each, equipped with 6 to 8-foot chains, including swivels and snap catches. When the testing tool was ready for lowering into the hole, superintendent Dahlitz discovered that Acme's plugs were not the proper size to fit Loffland's drill pipe. As a result, Loffland's plugs were used. These weighed 25 pounds each. Also, when it was found that the chains furnished by Acme would not fit the bails or handles of the Loffland plugs, a length of 1-inch manila rope was spliced to the bail or handle of each plug.

The testing tool was lowered to the proper depth in the hole, the test was run, and then it was pulled up for a few feet to "break it loose." The drilling crew then commenced

to raise it out of the hole, and in doing so, used the two Loffland plugs in capping the upper open ends of the drill pipe. As the men were all experienced, Dahlitz gave them no specific instructions. Neither did he instruct them concerning the manner of using the Loffland plugs.

In coming out of the hole, the crew screwed one of the plugs into the top of the drill pipe, which was held in position a short distance above the derrick floor. Then the free end of the rope (the other end being spliced to the bail of the plug) was tied to the elevator link by a bowline knot, which did not pinch or jam and could be readily untied. The drill pipe was pulled up about 85 feet so it would be unjointed at the bottom of the third section. Three sections make up a stand, and this stand was then set to one side and racked.

The derrick man, Holcomb, who was in the derrick at about the level of the top of the stand, unscrewed the plug and let it hang from the elevator link by the short end of rope. In the meanwhile, the other plug was used to cap the next stand. When the elevator was lowered, the first plug was untied from the link and the second plug tied to it. This process was repeated several times without incident.

After the crew had commenced to ''come out'' with the testing tool, Dahlitz and Watson, the subforeman for Richfield, left for a field service office nearby. Dahlitz had observed part of the operations which had been carried on in the usual manner when such plugs were used.

Morris, the Loffland foreman, who was in immediate charge of the crew, decided that the untying and tying of the plugs was too slow and cumbersome. He directed that a cat hook (a large, heavy hook with an eye at the top, and a spring latch closing the hook), should be tied to the casing hook just below the traveling block which held the elevator links; and that the free end of the plug rope should be tied to the bail of the plug, forming a rope loop attached to the bail. This was done. In resuming operations, the crew at the derrick floor, instead of tying or untying the rope, merely snapped or unsnapped the rope loop through the cat hook.

After several more stands of pipe had been pulled out, and as the derrick man was removing the plug from the top of the stand in the upper position of the derrick, the rope loop for some reason got out of the cat hook by twisting or some other means. It fell, and before the crew could get

out of the way, the plug struck plaintiff Hargrave on the arm, severely injuring him.

An examination made after the accident failed to show any failure or defect in the plug, the rope or the cat hook, all of which were introduced in evidence.

Mr. Holcomb, the derrick man for Loffland, testified that "the cat hook was used in this case to give more length so the rope wouldn't twist so much. . . . I unscrewed the plug with my hands, and at that time with the length of the ropes, why it gave enough free movement to unscrew the plug completely. After this means was taken, you could unscrew the plug all the way out without it twisting so much. . . . I don't remember how many stands we pulled until the plug dropped. . . . It was just the same procedure over and over, pulling one stand and loosening the plug, and the elevators go back down again for another stand. . . . Well, in twisting the plug out and unscrewing the plug the twist in the rope caused it to come out of the cat hook. . . . The plug dropped. . . . I was unaware of the fact that it was out of the cat hook because it was slightly over my head . . . and as I took the plug out of the pipe and reached over back of the elevator to turn it loose, I was surprised by the fact that it was out of the cat hook. It pulled out of my hand and dropped. . . . I hollered 'Watch out,' but the plug fell pretty fast."

Appellant urges that the failure of Acme to provide the proper items in accordance with the custom in the field was negligence which proximately contributed to the accident. Further, that there was "ample evidence from which the jury could have inferred negligence on the part of Richfield in failing to provide the proper tools and in permitting the use of makeshift tools that were unsafe, contrary to their duty by both custom and contract to furnish such proper tools and safety devices."

In this connection, appellant points out that respondent Hale, drilling foreman for Richfield, testified (when examined under Code Civ. Proc., § 2055) that he alerted Acme "that the test was coming up at an approximate time." He told them the type of drill pipe that was being used by Loffland, the type of threads in the pipe and the size, in order that the proper fittings could be brought with the tester. He personally instructed Loffland Brothers that they were to use plugs in connection with the tests. His subforeman or tool pusher, Watson, was charged with "supervising the drilling

operations in drilling the well . . . It is his responsibility to see that it is done in good oil field practice"; that the result of the water shut off test was as Richfield wanted it, and that the right material and right tools were used in making the test.

In answer to the question: "As a matter of fact it would have been his duty to have stopped the operation if they had tried to remove the tester without caps or plugs?" he stated: "If he would have been aware of that, yes."

He also testified that Acme was ordered to make the test at the sole expense of Richfield.

On cross-examination, Mr. Hale stated that during the drilling operation, Loffland Brothers "received their instructions several times during each calendar day"; that he was advised by Richfield's engineering staff; and that a representative of the State Division of Oil and Gas, and a licensed engineer of Richfield were present when the water shut off tests were made "to ascertain whether the test was successful and in accordance with the requirements."

Prior to the time that Mr. Hale telephoned Acme regarding making the test, he knew that Loffland had plugs for two sizes of pipe being used on the various wells. Also prior to the accident, Loffland "had been furnished a memorandum of written instructions concerning the drilling of the well by Richfield." Moreover, he had instructed Loffland to have plugs available and to use them. Previously he had seen Loffland Brothers using their own plugs.

On redirect examination, he was asked: "Now, Mr. Hale, I take it that if you gave them instructions about the use of these plugs that Richfield reserved the right to instruct them upon the use of the plugs, didn't they?" To this he answered: "Not the manner they were used."

At this point, appellant sought to elicit testimony from Mr. Hale to the effect that the Haliburton and Johnson companies who also maintained and rented testers in this field, customarily furnished plugs to cap the top of the drill pipe when their testers were being pulled. This testimony was first permitted and then struck by the court and objections sustained, even though appellant offered to prove that Loffland "never did use their own plugs" when testing, and "didn't even have plugs," but that the tester companies brought their own plugs with them.

Mr. Hale was permitted to testify that plugs were not provided by other tester companies on all occasions, but were

provided on some occasions. However, the court sustained an objection to appellant's question: "On the majority of occasions where a tester was used, the tester company furnished the plugs, isn't that right?"

Paul Dahlitz, drilling foreman for Loffland, testified that because the Acme plugs did not fit the drill pipe, they used Loffland plugs. Appellant inquired of him: "What is the custom with regard to the tester company furnishing plugs with the tester tool and tester?" And made an offer of proof of such custom. To this the court sustained respondents' objection that there was a direct showing that if there was such a custom, the parties knew it was not being conformed to. Therefore, whether such custom existed was irrelevant and immaterial.

■ The evidence clearly indicates that all parties were aware that plugs were required in making the test and that the lightweight plugs brought in by Acme did not fit the Loffland pipe. If, as appellant asserts, a custom existed in the field for the tester company to furnish adequate plugs with chains and swivels, evidence thereof and failure to observe it is admissible on the question of negligence. *Miller* v. *Midway Fishing Tool Co.,* 106 Cal.App.2d 612, 614 [235 P.2d 630], where it was stated:

"The rule is well established that evidence of the custom of a trade is ordinarily admissible in negligence cases where it has a bearing on either negligence or contributory negligence. (*Fowler* v. *Key System Transit Lines,* 37 Cal.2d 65 [230 P.2d 339] ; 38 Am.Jur., Negligence, § 317.) In *Burke* v. *John E. Marshall, Inc.,* 42 Cal.App.2d 195 [108 P.2d 738] (hearing denied), the court said: 'Where the issue is one of negligence in the performance or failure to perform some act, it is clear that evidence of the ordinary practice and custom which is generally followed in the performance of such act under the same or similar circumstances is competent. (*Thomas* v. *Southern Pac. Co.,* 116 Cal.App. 126 [2 P.2d 544] ; *Hennesey* v. *Bingham,* 125 Cal. 627 [58 P. 200].)' " See also *Covely* v. *C.A.B. Construction Co.,* 110 Cal.App.2d 30, 32 [242 P.2d 87].

Refusal to permit proof of custom was erroneous.

Respondents concede that on this appeal from a judgment of nonsuit, the evidence must be viewed in the light most favorable to appellant.

■ Such evidence shows that Richfield not only hired

Acme to supply the tools to make the test, but that both Acme and Richfield were present and participating in the testing operation. Moreover, Richfield retained the right to control and give instructions for the test to be made, timed it and gave instructions for the removal of the tester. This court is of the opinion that the evidence presented was sufficient to raise the question of fact: whether respondents by their failure to supply the proper plugs and safety chains and by permitting appellant to use the makeshift plugs, were guilty of negligence which was the proximate cause of the accident.

As stated in *Blumberg* v. *M. & T. Inc.,* 34 Cal.2d 226, 229 [209 P.2d 1]:

"A trial court is justified in granting a motion for nonsuit '. . . when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' (*Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190]; see also *Hale* v. *Depaoli,* 33 Cal.2d 228, 229 [201 P.2d 1]; *Neel* v. *Mannings, Inc.,* 19 Cal.2d 647, 650 [122 P.2d 576]; *Estate of Lances,* 216 Cal. 397, 401 [14 P.2d 768].) As stated in *Estate of Lances, supra,* page 400, 'Unless it can be said as a matter of law, that . . . no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.' "

For the reasons stated, the judgment is reversed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied May 18, 1954, and respondents' petition for a hearing by the Supreme Court was denied June 30, 1954.