[L. A. No. 24263. In Bank. Dec. 7, 1956.]

THURMAN TUCKER, JR., a Minor, etc., et al., Appellants, v. PHILIP LOMBARDO, Respondent.

458

Madden & McCarry for Appellants.

Moss, Lyon & Dunn, Gerold C. Dunn and Henry F. Walker for Respondent.

460

SPENCE, J.—Plaintiffs appeal from a judgment based on a verdict in favor of defendant in an action for damages for personal injuries. There is no substantial conflict as to any material fact, and no claim is made that the verdict is not supported by the evidence. The parties' opposing contentions center on the propriety of the giving and refusal of certain instructions. A review of the record, however, leads us to the conclusion that there was no prejudicial error.

Plaintiff Thurman Tucker, Jr. (hereinafter called Tommy), a 12-year-old boy, had been employed on Saturdays and Sundays for about three months at the Dominguez Skeet Range. On Sunday morning, May 3, 1953, the day of the accident, Tommy was ordered to work at the "high house," a tower-like building. His job there was to load a spring apparatus, known as a Remington Trap Machine, with "clay birds" or targets. He had done this work on about six previous occasions. The high house had an opening shielded by metal plates, through which the bird was ejected when another employee, operating in the control house, pressed a button effecting the bird's release. In skeet shooting, the gunner takes a "ready position" at the firing line and calls "pull." Upon this command the operator in the control house presses the button which releases the bird in the trap machine. Tommy, while working in the high house, was struck by shot discharged from a gun held by defendant, who was shooting from station number 8 on the skeet range. Tommy thereby lost the sight of one eye.

The range where the accident occurred was laid out in a half circle. Station number 1 was at the high house, number 7 was at the low house, and the intervening numbered stations formed a semi-circle arching to the south. Station number 8 was located at the midway point of an east-west line running from station number 1 to station number 7, and was about 60 feet to the east of the high house. When the bird was released from the high house for a gunner at station number 8, its path of flight would be toward the "breaking point," which was 18 feet north of station number 8 and the point beyond which the bird, if hit, would not count as a score. It appears that for scoring from station number 8, the travel distance for the bird, after emergence from the high house and before reaching the breaking point, would be about 67 feet. The bird, when ejected from the machine, traveled at 60 miles an hour or 90 feet a second, so that the shooter had only about two-thirds of a second in which to

make a score by hitting the bird. An expert on skeet shooting testified regarding the difficulty of shooting at station number 8 in that it "gives you about half as much time to shoot as the rest of them. You have to shoot much faster there."

The high house from which the bird was released was built of 2 by 4 framing lumber, which was covered by corrugated metal. It was 9½ feet high, 60 inches wide and 60 inches deep. The opening through which the bird was ejected, and behind which Tommy was employed in loading the trap machine, was in the east wall and was 7 inches long and 7 inches wide. The opening was shielded by two metal plates attached to the outer wall. The trap machine was mounted on a wooden shelf which extended 25½ inches back from the east wall of the high house. From the edge of this shelf to the rear or west wall of the house was 34½ inches. Tommy testified that in operating the trap machine, he would place a bird in the machine and cock it by pulling down a throwing lever; then he would step back to the wall behind him so as to be clear of the upward swing of the throwing lever. After the operator in the control house released the bird, Tommy would step forward toward the machine and reload it. There was no communication between the high house and the control house, and Tommy would step forward to reload without knowing whether a gun was fired at the released bird. While he could hear the discharge of a gun if there was not too much noise from the lever operating, he could not tell from which range or at what bird it was fired.

Defendant Lombardo was using a 12-gauge over-and-under shotgun, with which he was familiar. He had shot skeet once or twice previously. Standing in a "ready position" at station number 8, he looked toward the high house, called "pull" as the signal for the operator, and waited for the bird to emerge. He testified that he raised his gun and fired as the bird was approximately 2 feet from the high house. A second or two later defendant heard Tommy "holler" and saw him come out of the high house.

Tommy testified that after the bird had been released, he stepped forward to load the machine; that he was reaching for one of the birds stacked on the shelf alongside the machine when he was struck by some pellets from the shotgun; that he was thrown against the wall and his face was bleeding. One of the pellets caused a double perforation of his right eye, which was subsequently removed.

Defendant introduced photographs of the high house showing perforations resembling shot punctures in the corrugated metal around the opening. The operator of the control house testified that when the boys first started to work in the high house, they were told to stand back after putting the target in the trap machine; that he knew that shot had come before into the high house through the opening and that he had talked to the boys, including Tommy, about it but he did not remember whether he had so warned Tommy that particular morning. Tommy testified that he had never noticed the shot marks and indentations on the metal around the opening in the high house, and that while he was working there no shot had ever before come through the opening. Mrs. Ruth, coowner of the range with her husband, testified that she had not been aware that shooters had hit the high house though she admitted that she had seen the puncture holes on the metal around the opening and that they were "painted over." Defendant testified that he had never been inside the high house; that he knew that when shot was discharged from a shotgun, it spread out into a pattern but he did not know what the area of spread might be; and that he assumed that the shot would not go into the high house. He further testified that in talking to Mrs. Ruth immediately after the accident, she said "we know it is not your fault" and the "boys are often looking out the windows and they have been warned about that."

At defendant's request, the court gave the following instruction: "You are instructed that the duty owed by the defendant to the plaintiff in this case was to exercise ordinary care, that is the care that would be exercised by a reasonably prudent person in the same or similar circumstances. In this particular instance, however, the defendant was possessed of and using a firearm and a firearm is capable of causing severe injury. For that reason the defendant was required to foresee the possibility of injury and, to avoid it, to exercise a degree of care commensurate with and in proportion to the danger involved, and, in the exercise of ordinary care, the quantum or amount of care exercised *may be greater* than would be necessary if he was not handling a loaded weapon. This is but another way of saying that the amount of care to be exercised by a reasonably prudent person will vary with the circumstances, and where the danger of injury is greater the amount of care to be used *may be great*." (Emphasis added.)

This instruction correctly informed the jury that the standard of care required of defendant was that of ordinary care under the circumstances. (*Jensen* v. *Minard,* 44 Cal.2d 325 [287 P.2d 7]; *Warner* v. *Santa Catalina Island Co.,* 44 Cal.2d 310 [282 P.2d 12].) But plaintiffs attack the use of the permissive word "may" as diluting the established quantum of caution required of a person handling a loaded firearm. They claim that the instruction thereby injected a quantitatively false element into the jury's deliberations and left the jury without a proper appreciation of the controlling rules for judging defendant's conduct; and that they did not waive the error because of a "failure to request an instruction" which correctly recited the high degree of caution required to meet the test of ordinary care in the use of firearms. (*Sexton* v. *Brooks,* 39 Cal.2d 153, 158 [245 P.2d 496].) ■ With reference to this latter point, it should be said that the instructions which plaintiffs did propose upon the subject were incorrect and were properly refused because they attempted to place the burden of proof upon defendant to show that he was not negligent. (*Jensen* v. *Minard, supra,* 44 Cal.2d 325, 328-329.)

■ While the challenged instruction is not a model, it must be read with the other instructions and in the light of the circumstances, in determining whether there was any prejudicial error. It was only one of a series of instructions given on this phase of the case. Thus, the trial court first defined 'negligence" (BAJI 101), and then stated that it was "not an absolute term, but a relative one," so that "in deciding whether there was negligence in a given case, the conduct in question must be considered in the light of all the surrounding circumstances" (BAJI 101-A). Next, the court defined "ordinary care" (BAJI 102) and amplified that standard as follows: "Inasmuch as the amount of caution used by the ordinarily prudent person varies in direct proportion to the danger known to be involved in his undertaking, it follows that in the exercise of ordinary care, the amount of caution will vary in accordance with the nature of the act and the surrounding circumstances. To put the matter in another way, the amount of caution involved in the exercise of ordinary care increases or decreases as does the danger that reasonably should be apprehended." Then followed the challenged instruction concerning the application to the use of firearms. In the challenged instruction it was stated as a matter of law that "a firearm is capable of causing severe injury" and

for that reason "defendant was *required* to foresee the possibility of injury and, to avoid it, to *exercise a degree of care commensurate with and in proportion to the danger involved*"; and that "this is but another way of saying that the amount of care to be exercised by a reasonably prudent person will vary with the circumstances." (Emphasis added.) Thus, the jury was clearly informed that defendant was required to exercise a degree of care commensurate with and in proportion to the danger involved, and we do not believe that the use of the word "may" in the context of the instruction could have misled the jury in determining the quantum of caution which was required here.

The factual situation also has significant bearing on this point. Apparently defendant did exactly what he was supposed to do according to the generally accepted skeet rules and the particular practice on this range. In fact, the photographs of the high house showing how it had been peppered with shot indicate that defendant's shooting in that direction from station number 8 was precisely what was expected of him. The skeet shooting expert testified, without contradiction, that because the difficulty of a shot from station number 8 steadily increased as the bird approached the breaking point, it was customary and in accordance with nationally recognized rules for the shooter to point his gun at the high house and fire immediately upon the bird's emergence therefrom.

▇ There was no error in receiving evidence of the rules, practices and customs of skeet shooting. They have a direct bearing on the question of negligence even though they do not of themselves establish the standard of prudent conduct. (*Fowler* v. *Key System Transit Lines,* 37 Cal.2d 65, 68 [230 P.2d 339]; *Hargrave* v. *Acme Tool & Tester Co.,* 125 Cal. App.2d 34, 39 [269 P.2d 913].) Defendant did not know, and so far as the evidence shows, had no reason to suspect that there was any likelihood of injuring anyone by firing in the direction of the high house.

▇ It is an elementary principle that negligence is gauged by the ability to anticipate danger. "[R]easonable foresight of harm is essential to the concept of negligence, and supplies the criterion for determining whether it exists in a particular case, and reasonable foreseeability of harm is the fundamental basis of the law of negligence. . . . On the other hand, one is not bound to foresee every possible injury which might occur, or every possible eventuality, but only those which were

reasonably foreseeable; and one is not required to anticipate against dangers which it is not his duty to avoid." (65 C.J.S. § 5c (2) (a), pp. 354-359.) This principle of foreseeable danger as the basis for liability underlies the doctrine of the leading case of *Palsgraf* v. *Long Island R. Co.*, 248 N.Y. 339 [162 N.E. 99, 59 A.L.R. 1253], where Justice Cardozo recognized actionable negligence as involved in proceeding at reckless speed through a crowded city street, but stated at page 100: "If the same act were to be committed on a speedway or race course, it would lose its wrongful quality. The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." Here the unfortunate accident occurred on a skeet range. The person injured was not a member of the general public but an employee of the range who was performing his work in a place where he was presumably protected from injury from shots fired from the designated stations. Under these circumstances, the instructions appear to have been fully as favorable to plaintiffs' case as they were entitled to have them.

■ Nor may plaintiffs prevail in their contention that the trial court erred in refusing to instruct the jury on the doctrine of res ipsa loquitur. They rely on *Jensen* v. *Minard, supra,* 44 Cal.2d 325. There defendant fired a rifle at a sparrow in a strawberry patch and the bullet struck a child walking on the public road. No res ipsa loquitur instructions were requested in that case, but other instructions were given which erroneously foreclosed the jury from considering the mere happening of the accident itself as evidence of possible negligence. Unlike that case where ordinarily such injuries to the general public on a public road "do not occur if those using firearms use due care" (*Jensen* v. *Minard, supra,* p. 329), here it is at least arguable that the injury to Tommy resulted from his own negligent action or from the failure of the owners of the skeet range to provide a reasonably safe working area for him. ■ The applicability of the doctrine of res ipsa loquitur depends on whether it can be said, in the light of common experience, that the accident was more likely than not the result of defendant's negligence. "Where no such balance of probabilities in favor of negligence can be found, res ipsa loquitur does not apply." (*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 442 [247 P.2d 344]; *La Porte* v. *Houston*, 33 Cal.2d 167, 169 [199 P.2d 665].)

Accordingly, plaintiffs' proposed instructions, which stated unqualifiedly that the doctrine of res ipsa loquitur was applicable, were properly refused. (*Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682, 692 [268 P.2d 1041].)

■ Likewise the court did not err in refusing to give plaintiffs' instruction on contributory negligence. It read: "You are instructed that plaintiff Tommy Tucker was not contributorily negligent and you must find against the defendant upon that issue." Plaintiffs insist that under any view of the evidence Tommy could not have been negligent; but according to his own testimony, he moved forward to reload the trap machine as soon as the bird had been released.

The subject of contributory negligence was properly covered in the instructions. The court defined contributory negligence (BAJI 103), set forth the various issues to be determined in relation to whether there was contributory negligence chargeable against Tommy (BAJI 113), and declared that a child is not held to the same standard of conduct as an adult (BAJI 147). It appears that there was evidence from which the jury could have found that Tommy was guilty of contributory negligence: He had worked some three months on the skeet range and several times in the high house; he reasonably should have seen the peppered indentation marks on the high house and the metal plates around the opening from which the bird emerged; he had been warned of the danger that shot might come through the opening; he knew that he was not wearing any protective clothing or a face mask; and he was aware of the difficulty of shooting from station number 8. The jury could have inferred that Tommy had not stepped back on loading the machine but remained in direct line of the opening and so was hit, or that he had stepped back and thereafter stepped forward prematurely. Accordingly, whether Tommy was contributorily negligent was a question for submission to the jury rather than an issue for determination as a matter of law through the giving of plaintiffs' requested instruction.

■ Nor did the court err in giving, at defendant's request, instructions on the question of assumption of risk. These were BAJI 207 to 207-E. They included the distinction between contributory negligence and assumption of risk (BAJI 207-C), the declaration that the person's "age, experience and capacity along with all the other surrounding circumstances as shown by the evidence" should be considered (BAJI 207-D), and the statement that the "plaintiff

did not assume the risk of any injury that could have come to him only through the negligence of the defendant'' (BAJI 207-E). Here there was evidence from the circumstances of Tommy's work in the high house and his knowledge of skeet range practice which would support a finding that he had voluntarily assumed the risk of his employment. ■ Contrary to plaintiffs' position, the doctrine of assumption of risk is not limited to an action by an employee against his employer because of injuries suffered in the course of employment. (*Prescott* v. *Ralphs Grocery Co.*, 42 Cal.2d 158, 161-162 [265 P.2d 904] ; see also *Warnke* v. *Griffith Co.*, 133 Cal. App. 481, 494 [24 P.2d 583].)

■ Finally, there was no error in giving, at defendant's request, the following instruction: ''You are instructed that it is the duty of an employer to furnish to his employees a safe place for them to work. You are further instructed that defendant, Philip Lombardo, if exercising ordinary care himself, was entitled to assume that plaintiff's employer had furnished to plaintiff a safe place within which to work and he could further assume that the plaintiff would reasonably use the protection afforded to him by the employer.'' Plaintiffs argue that this instruction was improper in that it relates only to a duty owed by an employer to an employee as to safety regulations (Lab. Code, §§ 6401-6402; *Douglas* v. *Maloney*, 105 Cal.App.2d 284, 286 [233 P.2d 59] ; *Neuber* v. *Royal Realty Co.*, 86 Cal.App.2d 596, 619 [195 P.2d 501]), and can have no pertinence to the issues between the parties here. ■ But every person who is exercising ordinary care ''has a right to presume that every other person will perform his duty and obey the law.'' (*Hosking* v. *Danforth*, 1 Cal.App.2d 178, 181 [36 P.2d 427] ; see also *Giovannoni* v. *Union Ice Co.*, 108 Cal.App. 190, 195 [291 P. 461].) ■ Accordingly here, defendant was entitled to rely upon the assumption that the owners of the skeet range had obeyed the law and had exercised reasonable care toward him and toward persons working on the range through having the range in reasonably safe condition. Apparently the jury accepted defendant's testimony that he did not know, and had no reason to assume, that any shot fired from the designated stations would enter the high house. The jury therefore probably concluded that defendant had done exactly what he was supposed to do in firing from station number 8 and had violated no duty of care in so doing. The issues involved were fairly

presented in the instructions to the jury, and no prejudicial error has been shown.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and McComb, J., concurred.

CARTER, J.—I dissent.

The trial court gave the following instruction at the request of defendant: "You are instructed that the duty owed by the defendant to the plaintiff in this case was to exercise ordinary care, that is the care that would be exercised by a reasonably prudent person in the same or similar circumstances. In this particular instance, however, the defendant was possessed of and using a firearm and a firearm is capable of causing severe injury. For that reason the defendant was required to foresee the possibility of injury and, to avoid it, to exercise a degree of care commensurate with and in proportion to the danger involved, and, in the exercise of ordinary care, the quantum or amount of care exercised may be greater than would be necessary if he was not handling a loaded weapon. This is but another way of saying that the amount of care to be exercised by a reasonably prudent person will vary with the circumstances, and where the danger of injury is greater the amount of care to be used may be great."

The court refused to give the following instruction requested by plaintiff: "You are instructed that if a person is injured by the discharge of a gun in the hands of another who has entire control of it, the burden is cast upon the latter to prove that the gun was not fired at the party injured either intentionally or negligently, but the result was inevitable and without the least fault upon the part of the one handling the gun."

In my opinion the giving of the first instruction above quoted and the refusal to give the second instruction above quoted was prejudicial error which justifies a reversal of the judgment.

My views with respect to the legal problems involved in this case are expressed in my concurring opinion in *Jensen* v. *Minard,* 44 Cal.2d 325, at page 330 et seq. [287 P.2d 7], and for the reasons expressed therein I would reverse the judgment in the case at bar and grant plaintiff a new trial.