[Civ. No. 29689. First Dist., Div. Two. Dec. 20, 1972.]

WILLIAM CELLI, Plaintiff and Respondent, v.
SPORTS CAR CLUB OF AMERICA, INC.. et al..
Defendants and Appellants.

BOB REINFRIED, Plaintiff and Respondent, v.
VACA VALLEY RACEWAY et al., Defendants and Appellants.

WILLIAM RIBBS, JR., a Minor, etc., Plaintiff and Respondent, v.
VACA VALLEY RACEWAY et al., Defendants and Appellants.

514

## COUNSEL

Bledsoe, Smith, Cathcart, Johnson & Rogers and R. S. Cathcart for Defendants and Appellants.

J. Adrian Palmquist, David P. Weaver, Jr., and Jay R. Mayhall for Plaintiffs and Respondents.

## OPINION

**TAYLOR, P. J.**—Vaca-Dixon Enterprises, Durham Jones, Vaca Valley Raceway, Sports Car Club of America, Inc. and San Francisco Region Sports Car Club of America, the respective owners of the track facilities and operators and sponsors of an automobile race (hereafter defendants),

appeal from adverse judgments entered on jury verdicts in favor of each of the plaintiffs in three personal injury actions consolidated for trial. Plaintiffs, William Celli, Bob Reinfried and William Ribbs, Jr.,[1] were spectators at defendants' sports car racing event and were injured during a practice run by a car that left the track and skidded into the infield area to which each plaintiff had been admitted pursuant to a "pit pass" issued by defendants. The major contentions on appeal are that: 1) the trial court erred in refusing to admit the pit passes on the issues of liability and assumption of risk; 2) the release of liability agreements in the pit passes were not void on their face or void as against public policy; and 3) the trial court failed to instruct the jury on contributory negligence.

The basic facts are not in dispute. On Saturday and Sunday, September 12 and 13, 1964, defendants sponsored a two-day sports car event at the Vaca Valley Raceway in Solano County. The oval race track was constructed on a north-south axis, with seven turns. Cars raced on the track in a clockwise direction. Vehicles coming out of the last turn, No. 7, at the northern end of the oval entered the straightaway that ran about 3,000 feet south toward the start-finish line. The straightaway consists of a 60-foot-wide strip of asphalt. Only the outer 40 feet are used for the race track. The innermost 20 feet of the straightaway constitute a "pit lane" that is used by racing vehicles to enter and leave the track.

The pit lane is separated by a line of bales of hay weighing 60-70 pounds from the pit and paddock areas immediately west of the straightaway in the infield. The hay bales were not intended to serve as a protective barrier but only served to delineate the pit lane. Immediately west of the pit lane and also reached by it was the "pit area," a 12-foot-wide strip containing 45 "paddocks" or "pits," each assigned to a specific entrant for working on his car. The asphalt stops short of the pit area. The area immediately to the west of the 10- to 12-foot-wide pits is correctly designated as the "paddock area," although in racing, the term "pit area" is frequently used to describe both the pit and paddock areas.

A race spectator who held the usual $3-$5 general admission ticket was admitted to only two areas: 1) the grandstand located east of the straightaway; or 2) the infield area separated from the track, pit and paddock areas by a small fence. However, a spectator who held a special pit pass was admitted to the paddock and pit areas. The pit pass is essentially a ticket that could be bought at the track or obtained through the sponsors and managers of the race who mailed them to persons associated with

---

[1] Ribbs, a minor, appeared by his guardian ad litem.

the event. Four pit passes were usually issued without charge to each driver, who was also permitted to purchase two additional pit passes for $5 each.

Holders of pit passes are entitled to watch the race from the paddock area, including the row of automobiles parked at right angles to the track. These parked cars form a barricade to provide the only protection for those in the paddock area and the working pits. Holders of pit passes stand in front of the parked vehicles or sit on top of them.

The official rules of defendant, Sports Car Club of America, required that racing events be conducted with "the highest standards of safety." Persons in the pit area are entitled to the same high degree of protection provided for other spectators. The only protection afforded to the persons admitted into the paddock or pit areas by the pit passes on the day of the accident was the row of parked cars. Mr. John Luce, the chief steward of the race who was in "overall charge," testified that "obviously, the only way" to protect anyone in the pit area is "with some kind of a barrier that a car will not penetrate." On prior occasions, cars had spun out on the straightaway on the Vaca Valley Raceway. In addition, in 1964, prior to the instant accident, the press had reported two similar accidents at different race courses involving their respective pit areas.

Luce was aware of the previous occurrences on the Vaca Valley race track and knew that race cars could go out of control on straightaways, as well as on curves. From the practices at other tracks, Mr. Luce knew of the following safety precautions: 1) a ditch in front of the pit area; 2) a pit wall; 3) a barrier formed by 50-gallon oil drums partially filled with water and joined by a chain; 4) a brick wall; 5) piling hay bales in front of a barrier or placing them 3-4 bales deep; and 6) a sturdy wire fence anchored in concrete.

Defendants actively monitored the performance of the drivers during the races and practice runs, and kept a "driver's observation report" of each spin out, accident or other deviation. Luce, as chief steward, had authority to disqualify a contestant if he appeared to be lacking in skill or having difficulty that would endanger other personnel. Although the reports indicated that Connor, the driver in question, had four spins and also had crashed into a pole on the two days preceding the accident, he was not disqualified.

On the day of the accident, approximately 800 to 1,000 persons were in the pit and paddock areas, including women and children. Although the rules of the sponsoring organization allowed in the paddock and pit

areas children over 12 in the company of their parents, about 50 percent of the children were under 12 years of age. There is also a concession stand in these areas that sells hot dogs, hamburgers and soft drinks, and the booths of several tire dealers. A number of families bring barbeque pits or hibachi pots for picnicing and are allowed to move freely around anywhere in the pit and paddock areas. No signs restrict movement.

The accident occurred on the morning of September 13, while Connor was making a practice run. His vehicle was proceeding south on the straightaway at a speed exceeding 100 miles per hour and went out of control on the straightaway at a point about 50-100 feet north of the start-finish line and 3,000 feet beyond curve 7. The Connor vehicle spun out from the track, slammed backwards into another vehicle being worked on, and finally came to rest at the western edge of the pit area. Connor and another person were killed in the accident and each of the three plaintiffs was injured while standing in the pit area and about 40 feet from the race course, as indicated below.[2]

Defendants first argue that the trial court erred in refusing to permit the introduction into evidence of the pit passes that each plaintiff received and signed prior to entering the area where he was subsequently injured.

■ Preliminarily, we note that the release agreements in any event were invalid and unenforceable as to plaintiff Ribbs who at the time of the accident in 1964 was 9 years old. Civil Code section 35 provides that a contract of a minor made while under the age of 18 may be disaffirmed by the minor himself either before his majority or within a reasonable time thereafter. Disaffirmance may be made by any act or declaration and express notice to the other party is unnecessary. The filing of an action is sufficient (*Spencer* v. *Collins,* 156 Cal. 298 [104 P. 320]; *Pereira* v. *Toscano,* 84 Cal.App. 526 [258 P. 429]). We conclude, therefore, that on

---

[2]Plaintiff, William Celli, was injured while working on another participant's car in the pit area. Celli had attended prior races, was in the business of selling racing cars; and his company had sponsored vehicles in several races, including the two-day event here in question.

Plaintiff, Bob Reinfried, had come to the race with a friend, Johnson, who was a participant making practice runs at the time of the accident. Reinfried was injured standing at a point about 20 feet from the edge of the paved track with another person who was timing Johnson. Reinfried had been a track racer, had attended prior races and repaired racing cars.

Plaintiff, William Ribbs, Jr., who was then 9 years old, had attended numerous races with his father, a participant; Ribbs was watching the race about 20 feet from the paved track near the start-finish line.

this ground alone, the trial court did not err in excluding the pit passes signed by or on behalf of Ribbs.[3]

Defendants contend that the pit passes signed by Celli and Reinfried should have been admitted on the issues of liability and assumption of risk.

The entire pit pass, in less than six-point type, reads as quoted in the appendix, *infra* at page 525. Thus, the release provision simply provides that defendants are released from liability for injuries "resulting from any accident or other occurrence," and does not state that defendants are released from liability for injuries caused by their negligence.

Defendants contend that the above language constitutes a valid release sufficient to bar recovery by plaintiffs from injuries received as a result of defendants' negligence. Accordingly, the first question presented is whether an exculpatory agreement, written in general terms, such as this, can immunize a defendant from the consequences of his own negligent conduct.

The well established rule in this state is that where the language of an instrument purporting to exculpate one of the parties for its future negligence, was prepared entirely by the party relying on it, words clearly and explicitly expressing that this was the intent of the parties are required (*Basin Oil Co.* v. *Baash-Ross Tool Co.,* 125 Cal.App.2d 578, 593 [271 P.2d 122]; *Butt* v. *Bertola,* 110 Cal.App.2d 128, 138-140 [242 P.2d 32]; *Barkett* v. *Brucato,* 122 Cal.App.2d 264, 275-278 [264 P.2d 978]; *Sproul* v. *Cuddy,* 131 Cal.App.2d 85, 95 [280 P.2d 158]). *Woodall* v. *Wayne Steffner Productions,* 201 Cal.App.2d 800 [20 Cal.Rptr. 572], specifically held (at p. 802) that an agreement purporting to release from "any and all responsibility, liability or claims" did not absolve the defendant from liability from its own negligence that led to the injury of the plaintiff, a stunt man.

*Sproul* v. *Cuddy, supra,* reached a similar result as to a rental agreement for a defective walker which provided that the licensor ". . . will in no way be responsible for damages resulting from the use thereof." The court said at page 95: "Except where discountenanced by public policy or some statutory inhibition, a party may contract to absolve himself from liability for negligence; the law, however, looks with disfavor on such attempts to avoid liability or secure exemption from one's personal negligence, and construes such provisions strictly against the person relying on them, especially

---

[3]The record indicates that one pit pass was signed by Ribbs and a second by his *father.*

when he is the author of the document; to be sufficient as an exculpatory provision against one's own negligence, the party seeking to rely thereon must select words or terms clearly and explicitly expressing that this was the intent of the parties; and that seemingly broad language will not be isolated from its context and will be read with due regard to the maxim of strict construction."

■ Similarly here, the language of the pit passes must be construed most strongly against defendants as a product of their own draftsmanship and "designed to whittle down the normal and ordinary rights of a customer" (*Burr* v. *Sherwin Williams Co.,* 42 Cal.2d 682, 693-694 [268 P.2d 1041]). In this connection, division one of this court observed in *Barkett* v. *Brucato, supra,* at page 278, that general exculpatory provisions, if enforceable at all, should be limited to passive negligence. Subsequently, our Supreme Court recognized and adopted this rule of strict construction for an exculpatory indemnity clause in *Vinnell Co.* v. *Pacific Elec. Ry. Co.,* 52 Cal.2d 411, 414-415 [340 P.2d 604].

Although *Vinnell,* unlike *Barkett,* did not differentiate between active and passive negligence, our Supreme Court subsequently noted this distinction and indicated that an indemnity agreement phrased in general language will not protect an indemnitee whose active negligence is a proximate cause of the injury (*Goldman* v. *Ecco-Phoenix Elec. Corp.,* 62 Cal.2d 40 [41 Cal.Rptr. 73, 396 P.2d 377]). The court in *Goldman,* at page 48, distinguished indemnity agreements that merely shift the risk from one negligent tortfeasor to another from exculpatory agreements, like the one here, where a negligent tortfeasor attempts to shift the risk of his negligence back to the victim.

■ However, we think the *Goldman* rationale is applicable here, and hold that defendants' release agreement, phrased in general language, cannot provide a release where, as here, active negligence is a proximate cause of the injury. The uncontroverted evidence summarized above indicates that defendants, because of their own knowledge, acquiescence or participation in the racing event, were actively negligent.

■ Furthermore, there is a distinction between passive negligence and a negligent omission, such as the failure of defendants to provide a barrier or some other means of protecting the spectators admitted to the paddock and pit areas. As stated in *King* v. *Timber Structures, Inc.,* 240 Cal.App.2d 178, at page 182 [49 Cal.Rptr. 414], the difference is that one is passively negligent in merely failing to act in fulfillment of a duty of care imposed by law, while one is actively negligent by participating in some manner in the conduct of omission that caused the injury. As this

court (division one) said in *Cahill Bros., Inc.* v. *Clementina Co.,* 208 Cal. App.2d 367 at page 382 [25 Cal.Rptr. 301]: ". . . if the person seeking indemnity personally participates in an affirmative act of negligence, or is physically connected with an act or omission by knowledge or acquiescence in it on his part, or fails to perform some duty in connection with the omission which he may have undertaken by virtue of his agreement, he is deprived of the right of indemnity."

Defendants argue that the instant case is controlled by *Palmquist* v. *Mercer,* 43 Cal.2d 92, 98 [272 P.2d 26], and that the applicable general rule is that a person who signs a release in the absence of fraud is bound by its contents and estopped from showing that those provisions are contrary to his intentions or understanding. *Palmquist* is simply not in point. There, to discharge the defendant riding academy from liability, the plaintiff signed a general release that did not mention negligence. However, the evidence showed that the manager of the stable knew that the particular horse assigned to plaintiff was difficult to control and not suitable for an inexperienced rider. In reversing a judgment of nonsuit, the Supreme Court held that the evidence presented the issue of whether there was fraud or misrepresentation on the part of the manager of the riding academy in causing Palmquist to sign a release absolving the academy from all liability when the manager knew of Palmquist's inexperience. Thus, the court directed its opinion solely to the question of fraud and never even raised the question of whether a general release can exculpate a tortfeasor from active negligence. In any event, subsequent to *Palmquist,* our Supreme Court held in *Vinnell* that general language used in the release therein does not exculpate a tortfeasor from his active negligence.

 We note that defendants failed to raise the question of active as against passive negligence in their offer of proof. Accordingly, the trial court properly rejected their imprecise offer of the pit passes for this additional reason (Witkin, Cal. Evidence (2d ed. 1966) § 1311; Evid. Code, § 354, subd. (a)).

As to the cases from other jurisdictions, cited by defendants, the following are readily distinguishable as the language of the release agreements involved *expressly absolved* the defendants from negligence (*Theroux* v. *Kendenburg Racing Association* (1965) 50 Misc.2d 97 [269 N.Y.S.2d 789]; *Solodar* v. *Watkins Glen Grand Prix Corporation* (1971) 36 App.Div.2d 552 [317 N.Y.S.2d 228]; *Corpus Christi Speedway* v. *Morton* (Tex. Civ. App. 1955) 279 S.W.2d 903; *French* v. *Special Services, Inc.* (1958) 107 Ohio App. 435 [8 Ohio Ops.2d 421, 159 N.E.2d 785];[4] *Ciofalo* v. *Vic*

---

[4]Another significant distinguishing factor is that in the *Theroux, Solodar, French* and *Corpus Christi* cases, the plaintiffs were race drivers and not spectators. In

*Tanney Gyms, Inc.* (1961) 10 N.Y.2d 294 [220 N.Y.S.2d 962, 177 N.E. 2d 925]).

In both *Bernstein* v. *Seacliff Beach Club, Inc.* (1962) 35 Misc.2d 153 [228 N.Y.S.2d 567], and *Hertzog* v. *Harrison Island Shores, Inc.* (1964) 21 App.Div.2d 859 [251 N.Y.S.2d 164], the courts construed exculpatory agreements not specifically exempting the respective beach club operators from liability for "negligence" as being ineffective to preclude recovery for negligently inflicted injuries suffered by member-patrons. The remaining out-of-state cases cited by defendants, *Hine* v. *Dayton Speedway Corp.* (1969) 20 Ohio App.2d 185 [49 Ohio Ops.2d 249, 252 N.E.2d 648], and *Lee* v. *Allied Sports Associates, Inc.* (1965) 349 Mass. 544 [209 N.E.2d 329]),[5] both holding that a generally worded exculpation clause was sufficient to relieve a defendant from his own negligence, are contrary to the California cases discussed above.

We conclude, therefore, that the release agreements did not absolve defendants from the consequences of their own negligence as the express words used did not specifically and clearly declare this result. Furthermore, although we need not decide the issue, we question whether public policy in this state would permit judicial enforcement of a provision printed in such small type and designed to permit a tortfeasor to shift the risk of the injury to the victim even where the release is sufficient to encompass defendants' own negligence (*Tunkl* v. *Regents of University of California,* 60 Cal.2d 92, 97 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]). We note that the statutes pertaining to retail installment sales (Civ. Code, § 1803.1) and parking lots (Civ. Code, § 1630) require at least eight-point type.

Defendants next contend that the trial court further erred in not permitting the introduction into evidence of the pit passes on the questions of assumption of risk.[6] The record indicates that the trial court, in the proper exercise of its discretion, properly refused to admit them on this limited issue. On the first day of trial, January 12, 1970, the court rejected defendants' offer of proof on the issue of liability ruling that the pit passes

---

*Morrow* v. *Auto Championship Racing Assn., Inc.* (1972) 8 Ill.App.3d 682 [291 N.E.2d 30], cited at oral argument, the plaintiff-driver was given a copy of the release agreement to take home; although the agreement did not mention the negligence of the defendants, the court held that the agreement so provided and was not violative of public policy.

[5]In *Lee,* the plaintiff had entered the pit area posing as a driver and the defendant speedway owner held a license to conduct auto racing.

[6]The record indicates that the court instructed the jury on assumption of risk but not on contributory negligence.

could not serve as a defense against negligence. The court, however, stated that this ruling did not foreclose defendants from making further offers of proof as the trial progressed. The following day at an in-chambers conference, defendants renewed their offer, adding that the pit passes would support their defense of assumption of risk. The court rejected this offer.

The following week, defendants moved for a nonsuit and again made an offer of proof stating that the pit passes were relevant to the issues of liability, assumption of risk and contributory negligence. At this time, the court reminded counsel that its ruling did not preclude defendants from questioning[7] plaintiffs about the pit passes in order to establish notice of the dangerous nature of the activity, and was surprised that counsel had not done so. Defendants' counsel replied that he had understood from the court's prior rulings that he was not to go into the pit passes on cross-examination. The court then reiterated that at a prior and unreported conference in chambers, it had indicated that defense counsel would not be restrained from going into the matter of notice, and also reminded counsel that as to assumption of risk, plaintiffs had to have knowledge of the particular risk assumed. The court then again denied the offer of proof.

■ A trial court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice, confuse the issues, or mislead the jury (Evid. Code, § 352). ■ As the pit passes were clearly inadmissible on the question of liability, any admission under a limiting instruction on other issues could have only misled and confused the jury to the prejudice of plaintiffs. Thus, it appears from the record that the trial court's decision to exclude the pit passes on all issues but at the same time to permit defendants to cross-examine plaintiffs with respect to any alleged notice imparted by the passes, was a proper exercise of its discretion and fair to both sides. It is well settled that the matter of excluding prejudicial evidence is largely one of discretion on the part of the trial court (*Adkins v. Brett,* 184 Cal. 252, 258 [193 P. 251]). There was clearly no abuse of discretion here.

We think the pit passes were properly excluded on the additional ground that there was no evidence from which the jury could infer that any of the plaintiffs had actual knowledge of the particular danger, as well as an appreciation of the risk involved, and the magnitude thereof (*Dorsic v. Kurtin,* 19 Cal.App.3d 226, 234-235 [96 Cal.Rptr. 528]; *Curran v. Green Hills Country Club,* 24 Cal.App.3d 501 [101 Cal.Rptr. 158]). Rather,

---

[7]Defendants on this appeal do not urge that their cross-examination was improperly *so restrained.*

defendants' own expert testified that it was unusual for racing cars to go out of control on the straightaway. ■ Furthermore, it is not assuming a risk to assume that one is not exposed to a danger which could result only from a violation of duty by some other person (*Johnson* v. *Nicholson,* 159 Cal.App.2d 395 [324 P.2d 307]). In the instant case, plaintiffs were clearly invitees to whom defendants, as landowners, owed a duty to exercise reasonable care in the management of their property in view of the probability of injury (*Rowland* v. *Christian,* 69 Cal.2d 108, 119 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]).

Finally, defendants contend that the trial court erroneously refused their proffered instructions on contributory negligence. Defendants, citing *Prescott* v. *Ralphs Grocery Co.,* 42 Cal.2d 158, 162 [265 P.2d 904], urge that the jury should have been permitted to determine whether or not plaintiffs, in the exercise of ordinary care, should or could have discovered the danger. This contention, however, overlooks the fact that plaintiffs were invitees and were injured while lawfully standing in the precise area designated by their pit passes, a form of admission ticket made available to members of the public. ■ A patron of a recreation facility open to the paying public is not obliged to make a critical examination of the area he is about to use in order to determine whether or not it is safe. On the contrary, he has the right to assume that those in charge have exercised due care in the matter of inspection and have taken the proper precautions for the safety of their patrons (cf. *Chardon* v. *Alameda Park Co.,* 1 Cal. App.2d 18, 23 [36 P.2d 136]). ■ Furthermore, every person has a right to presume that every other person will perform his duty and obey the law and in the absence of reasonable ground to think otherwise, it is not negligence to assume that he is not exposed to danger which could come to him only from violation of law or duty by such other person (*Harris* v. *Johnson,* 174 Cal. 55, 58 [161 P. 1155]). ■ Thus, each of the plaintiffs was entitled to rely on the assumption that defendants would exercise reasonable care for his safety (*Tucker* v. *Lombardo,* 47 Cal.2d 457 [303 P.2d 1041]; *Kavner* v. *Holzmark,* 185 Cal.App.2d 138, 142 [8 Cal.Rptr. 145]).[8]

In addition, the evidence shows, as a matter of law, that plaintiffs did not depart from the reasonable man standards and hence were not contributorily negligent. The pit area in which each of the three plaintiffs was injured was located along the straightaway and was separated from the

---

[8]*Goade* v. *Benevolent etc. Order of Elks,* 213 Cal.App.2d 189 [28 Cal.Rptr. 669], cited by defendants, is distinguishable on its facts as there, the sports car went out of control on a turn, one of the obvious dangers arising from the normal conduct of the sport.

race cars by a well marked 20-foot pit lane lined with bales of hay. Connor's vehicle went out of control on the straightaway about 3,000 feet from the nearest curve. Plaintiffs Reinfried and Ribbs were both standing near the row of parked cars along the pit lane about 20 feet from the pavement or about 40 feet from the race course. Plaintiff Celli was working on another participant's car in one of the working pits provided by defendants. Thus, two of the plaintiffs were standing in the only portion of the pit area that had any protective barrier at all, namely, the row of cars parked at right angles to the race course. Plaintiff Reinfried (like defendants' expert) testified that he had never heard of a race car going out of control on a straightaway. It is uncontroverted that within the entire pit area, defendants had not posted any warning signs restricting the movement of the patrons. The evidence also indicated that an additional 800 to 1,000 persons were milling about in the pit area. In view of these facts, the trial court properly refused to instruct the jury on contributory negligence.

The judgments are affirmed.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied January 19, 1973, and appellants' petition for a hearing by the Supreme Court was denied February 14, 1973.

## APPENDIX

**READ AND SIGN** **PIT PASS** **SUNDAY, SEPT. 13, 1964**

**Deposit at gate; not good if detached**

The undersigned acknowledges he/she has read and signed the complete release of liability and agreement originally a part of this pass and has signed and deposited same at the admission gate or with a race official.

Signature _____ **448**

**READ AND SIGN** **PIT PASS** **SATURDAY, SEPT. 12, 1964**

**Deposit at gate; not good if detached**

**RELEASE OF LIABILITY AND AGREEMENT**

Each of the undersigned does hereby certify that he is of lawful age and hereby, for himself, his heirs, executors and assigns, releases, remises and forever discharges SAN FRANCISCO REGION, SPORTS CAR CLUB OF AMERICA, its officers, governors, members, agents and employees and all participants in the above mentioned event, and any individual, group or association or corporation, if any, sponsoring the event or owning property on which the event is held, and each of them, and the heirs, assigns, administrators and executors of each of them of and from any and every claim, demand, action or right of action whatsoever kind or nature, in law or in equity, arising from or by reason of any injury to or death of any person, or any damage to or destruction of property resulting or alleged to result from or arise out of any accident or other occurrence during or in connection with the foregoing event and/or any practice session in connection therewith, and/or any use of the course and/or facilities provided for such event.

This release is given and this agreement is made in consideration of and as a condition of SAN FRANCISCO REGION, SPORTS CAR CLUB OF AMERICA, its officers, and governors, members, agents and employees (and sponsors and property owners) permitting the undersigned and/or any or all of them to use said course or circuit and/or other facilities, or to act as an official in connection with such event, or in any other capacity of whatsoever nature. The undersigned further agrees that he will be bound by and obey the rules and regulations of the SAN FRANCISCO Region of the SPORTS CAR CLUB OF AMERICA and its sponsors.

Each of the undersigned further agrees that San FRANCISCO Region of the SPORTS CAR CLUB OF AMERICA and/or its sponsors and/or the owners of the property on which foregoing event is held shall not for any reason whatsoever be deemed to warrant or guarantee in any respect the competency or mental or physical condition of any driver or mechanic participating in said event or any official acting in connection with said event therewith, or the efficiency or mechanical condition of any vehicle taking part in such event or in practice therefor or otherwise used in connection therewith, or that said course or circuit or any part or portion thereof, shall not be obstructed by spectators or other persons or otherwise, or that the rules governing this event shall be observed by any owner, driver, mechanic, navigator, official or any other person taking part therein or acting in connection therewith.

No officer, governor, agent, servant or other representative of the SAN FRANCISCO Region of the SPORTS CAR CLUB OF AMERICA is authorized to vary the terms and provisions of this instrument or to make any representation contrary to any provisions thereof or otherwise in connection with the subject matter hereof. Each of the undersigned further states that he has carefully read the foregoing instrument in its entirety, knows the contents thereof, and signs the same as his own free act and deed.

Signature _____ **448**

**Saturday and Sunday, September 12 and 13, 1964**