[No. A049465. First Dist., Div. Four. Dec. 31, 1990.]

YVETTE MARIE SAENZ, a Minor, etc., Plaintiff and Appellant, v. WHITEWATER VOYAGES, INC., Defendant and Respondent.

COUNSEL

Jeffrey Craig Thayer and Ross Howell Sobel for Plaintiff and Appellant.

Edson & Laplante and Domenic D. Spinelli for Defendant and Respondent.

OPINION

ANDERSON, P. J.—Edward Saentz (decedent) drowned at Murderer's Bar Rapid after falling out of a raft guided down the Middle Fork of the American River by employees of respondent commercial rafting company. The trial court entered summary judgment for the rafting company in the wrongful death action brought by decedent's heir (appellant).[1] We affirm on the basis that the decedent expressly assumed the risks attendant to white-water rafting so as to relieve the rafting company of its duty of care toward him.

## I. FACTUAL BACKGROUND

In early 1988 Pat DeBurgh organized a group of card dealers from "The Bicycle Club" to participate in a three-day white water rafting trip hosted by respondent Whitewater Voyages, Inc. (Whitewater). DeBurgh reserved

---

[1] Appellant herein is Yvette Marie Saenz, a minor, by and through her guardian ad litem and trustee, Joe P. Saenz.

the space, collected fares, and confirmed all arrangements for a June 20-22 trip down the Middle Fork of the American River. Decedent was one of the participants. He was 28 years old at the time, 5 feet 10 inches tall, and weighed 280 pounds. He told his father he was going "on a boating thing," "up on the American River."

On the morning of June 20 the Whitewater guides met the participants outside of Auburn and drove them by van to the put-in site. On the way they stopped for gas, and decedent and his friends bought some beer. At the "put-in site," members of the group, including decedent, completed and signed a "Release and Assumption of Risk Agreement" (release).[2]

Trip leader David Butterfield gave a safety talk, covering such topics as what to do when thrown in the river, how to swim in that situation, how to get out from underneath the raft and the dangers of white water rafting. He warned: "[W]hitewater rafting is not a Disneyland ride and you can get hurt and even die."[3]

The guides assisted the participants in adjusting their life jackets for a snug fit; decedent was fitted with an adult large/extra large type IV personal flotation device. He wore the device throughout the trip and was wearing it when he drowned. Participants were also told that helmets must be worn on all class IV rapids.

---

[2] No one actually saw decedent execute the form. However, David Moore, examiner of questioned documents, reviewed (1) the original release signed by "Ed Saenz," (2) subpoenaed employment records of decedent, (3) other documents identified by decedent's mother which contained his signature and handwriting, as well as (4) the releases of six other trip participants. Moore expressed the opinion that decedent in fact filled out and signed the original release. Moore also examined all the original releases for indentations, using the "Electrostatic Detection Apparatus." He concluded all the forms except one bore indentations of handprinting and signatures from at least one of the other forms and, thus, the forms were positioned on top of one another when the original writing took place. Decedent's form was the fourth from the bottom in a stack of seven.

Appellant attempted below to refute Moore's testimony with testimony of decedent's parents. Upon being shown the release, neither could positively identify or disclaim the signature as his (mother: "I don't know. I can't tell . . . . Well, it might be. But I don't—"; father: "I don't know. That doesn't seem like his signature. I don't know. It's pretty close, but I've seen his signature before . . . . I can't be sure"). On appeal appellant does not resurrect this argument.

[3] Richard Forney, a trip participant and coworker of decedent, initially gave a declaration for appellant, stating therein that although the guides briefly explained characteristics of the rafts and demonstrated signals and paddle strokes, they never mentioned "anything about potential risks of injury, death or drowning." Earlier, an investigator for Domenic Spinelli, Whitewater's attorney, had interviewed Forney. Upon receipt of Forney's declaration, Spinelli arranged for his investigator to contact Forney about the accuracy of some of his statements. Forney acknowledged that some statements were incorrect, and gave a second declaration to correct his misstatements. Therein Forney declared it was "incorrect that the potential risks of injury, death or drowning were not mentioned. I simply do not recall whether they were or not."

On the first day, decedent crewed on the raft guided by Butterfield. The crew encountered two class III[4] rapids as well as Tunnel Chute Rapid, a class IV rapid considered by William McGinnis, founder of Whitewater, to be "by far the most difficult and dangerous rapid of the three day trip." All passengers were given an opportunity to scout the rapid in advance, as well as the option of walking around the trail instead of running the rapid. Butterfield advised them not to "pay any attention to any peer pressure and to make this choice on their own."

Butterfield also explained how they must enter the eddy so as not to become trapped, and related that last year a woman sustained injuries when she fell out and was crushed against the wall of Tunnel Chute.

Toward the end of the first day decedent swam in relatively calm deep water for a short time. That night, some of the guides left to purchase beer for the guests.

The second day included several class III and class IV rapids as well as a portage around an unrunnable stretch of the river. Decedent was in Mark Thomas's raft that day. Thomas gave each participant the opportunity to guide the raft while travelling over calmer water; decedent took his turn.

Thomas also reviewed the possibility of falling out, and explained how to swim when that happens. Decedent fell out at the bottom of Menage a Trois,[5] a class IV rapid. He was pulled back into the raft after swimming about 30 seconds. The entire crew then portaged around Rucka Chucky Falls, which Thomas described as "a rather long" and "difficult portage."

Mark Artesani, a trip participant, reported that on the second night the "lead guide" drank beer, smoked marijuana and stepped on a hot coal and burned his foot.

Prior to starting out on the third morning, guide Thomas taught decedent and others how to swim a rapid, practicing on small ripple rapids near

---

[4] Whitewater's brochure gives each river a rating using the "I to VI International Scale of River Difficulty." The three-day trip down the Middle Fork of the American River is rated II-IV. Class II rapids are labeled "Medium" and described as "Rapids of moderate difficulty with passages clear." Class III rapids are labeled "Difficult" with the description: "Waves numerous, high, irregular; rocks; eddies; rapids with passages clear through narrow; requiring expertise in maneuvering." Finally, class IV rapids are "Very Difficult": "Long rapids; waves powerful, irregular; dangerous rocks, boiling eddies; powerful and precise maneuvering required."

[5] Forney originally declared that the guides never explained or discussed that anyone had been killed while rafting on the river. In his declaration to correct mistakes, he admitted he "specifically" recalled that the guides told them "about a person who died after being pinned up against a wall at Menage a Trois Rapid. There were other war stories throughout the trip, however I do not recall the specifics of any of them."

camp. Before they began rafting, Thomas reviewed that Murderer's Bar, the last class IV rapid, was optional and no one had to run it.

That afternoon the entire group parked for about 15 minutes before tackling the rapid. Trip leader Butterfield again told the participants they could "take out" at that point and ride back with the vans rather than running the rapid. Everyone scouted the rapid except decedent. He previously had indicated to his friends that he was tired and his legs were sore. Coworker Forney stated he "formed the impression . . . that Edward Saenz was exhausted and along with the rest of the trip participants, realized Murder's Bar rapid was the last rapid, and he wanted to get it over with."

After scouting the rapid Thomas spent about five minutes with decedent "directly" explaining the configuration of Murderer's Bar, how they would approach it, and what crew maneuvers were necessary. Thomas explained to decedent the dangers of the rapid, including the large rock they must avoid striking, as well as the eddy on the right of the rapid. Finally, Thomas explained the possibility of falling out and swimming and if this occurred, decedent should relax, take a breath and keep his feet up, pointed down river. Thomas asked decedent twice if he wanted to run the rapid; decedent replied affirmatively both times.[6] Thomas also repeated to the entire crew that they could "take out" with the vans rather than run the rapid. Decedent fell out of the raft going down Murderer's Bar and drowned. Mark Artesani, another participant riding in the raft ahead of decedent's raft, stated he and another guide were concerned that "we did not yet use throw bags" in this rapid "like other rapids" where they "would spread out on the sides" for safety.

## II.  DISCUSSION

Whitewater moved for summary judgment upon related theories of express and implied assumption of the risk. Because we find that summary judgment was properly granted on the former theory, we do not reach the applicability of the latter.

### A.  *Background*

■   Case law recognizes that assumption of the risk can be express or implied. Express assumption of risk is a contractual matter and comes into play where the plaintiff, in advance, expressly "agrees not to expect the

---

[6] Forney said decedent's words were "Let's get it over with." Thomas described his response as "Let's do it."

potential defendant to act carefully . . . ." (*Coates* v. *Newhall Land & Farming, Inc.* (1987) 191 Cal.App.3d 1, 7 [236 Cal.Rptr. 181].) In other situations a person implies consent to certain risks by voluntarily encountering a known danger.

Our Supreme Court's far-reaching decision in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 808 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], which replaced the "all-or-nothing" rule of contributory negligence with a system of comparative fault, changed many facets of our negligence rules, including facets of the assumption of risk doctrine. The court in *Li* explained: "[W]e have recognized in this state that this defense overlaps that of contributory negligence to some extent and in fact is made up of at least two distinct defenses. '. . . in one kind of situation, to wit, where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence . . . . Other kinds of situations within the doctrine of assumption of the risk are those, for example, where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him. Such a situation would *not* involve contributory negligence, but rather a reduction of defendant's duty of care.'" (*Id.*, at pp. 824-825.)

Under *Li*, the defense of unreasonable assumption of the risk merges with the scheme of assessing liability in proportion to fault. (*Li* v. *Yellow Cab Co., supra*, 13 Cal.3d at p. 825.) However, *Li* had no impact on express assumption of risk, which remains a complete bar to recovery in a negligence action. (*Von Beltz* v. *Stuntman, Inc.* (1989) 207 Cal.App.3d 1467, 1477, fn. 3 [255 Cal.Rptr. 755].)

### B. *Express Assumption of the Risk*

■ Whitewater maintains that the release[7] which decedent signed was an express assumption of risk which served to bar this wrongful death action. We agree.

A wrongful death plaintiff is subject to any defenses which the defendant could assert against the decedent, including the decedent's express

---

[7]The agreement provided: "I am aware that certain risks and dangers may occur on any river trip with Whitewater . . . . These risks include, but are not limited to, hazards of and injury to person and property while traveling in rafts on the river, accident or illness in remote places without medical facilities, the forces of nature . . . . [¶] . . . I hereby assume all of the above risks and, except in the case of gross negligence, will hold Whitewater . . . harmless from any and all liability, actions, causes of action, debts, claims, and demands of every kind and nature whatsoever which I now have or which may arise out of or in connection with my trip or participation in any activities with Whitewater . . . ." The agreement further stated it operated as a release and assumption of risk for his heirs.

agreement to waive the defendant's negligence and assume all risks. (*Madison* v. *Superior Court* (1988) 203 Cal.App.3d 589, 597 [250 Cal.Rptr. 299] [upholding release by decedent drowned while participating in scuba diving course].) The decedent's agreement to accept the risk of harm stemming from the defendant's negligent conduct is valid unless it contravenes public policy. (*Coates* v. *Newhall Land & Farming, Inc.*, *supra*, 191 Cal.App.3d 1 at p. 8 [validating release of decedent killed riding a dirt bike in off-highway vehicle park].) Whereas an agreement purporting to exempt a common carrier of persons from liability for negligence is against public policy (*Walther* v. *Southern Pacific Co.* (1911) 159 Cal. 769, 772 [116 P. 51]), that policy does not impact Whitewater because Whitewater is a private carrier.[8] There is no public policy in California opposing "private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party . . . ." (*Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693] [invalidating release by patient as condition of admission to charitable research hospital as against the public interest]; *Coates* v. *Newhall Land & Farming, Inc.*, *supra*, 191 Cal.App.3d at p. 8.)

Express assumption occurs when the plaintiff, in advance, expressly consents " '. . . to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone . . . . The result is that . . . being under no duty, [the defendant] cannot be charged with negligence.' " (Prosser & Keeton, Torts (5th ed. 1984) § 68, pp. 480-481, fn. omitted; *Coates* v. *Newhall Land & Farming, Inc.*, *supra*, 191 Cal.App.3d at p. 8.)

Not all contractual releases and assumptions achieve this result. An agreement exculpating the drafter from liability for his or her own future negligence must clearly and explicitly express that this is the intent of the parties. (*Celli* v. *Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 518 [105 Cal.Rptr. 904] [holding that general release language in pit pass signed by spectators injured in pit area of race course by out-of-control race car did not immunize defendants from their own active negligence].) Courts will not isolate seemingly broad language from its context, and will observe the rule of strict construction when reading such agreements. (*Id.*, at p. 519.)

In *Celli*, the court invalidated the release because the express language did not declare its purpose to absolve the defendants of the consequences of

---

[8] Unlike common carriers, private carriers are not bound to carry any person for any reason unless they enter into an agreement to do so. (*Samuelson* v. *Public Utilities Com.* (1951) 36 Cal.2d 722, 730 [227 P.2d 256].)

their own negligence. (*Celli* v. *Sports Car Club of America, Inc.*, *supra*, 29 Cal.App.3d at p. 521.) So, too, a lengthy, convoluted sentence which itself contained no releasing language was found deficient because it was not "clear, explicit and comprehensible in each of its essential details." (*Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 318-319 [195 Cal.Rptr. 90] [invalidating release signed by dune buggy driver injured in race when his vehicle hit a parked spectator vehicle].) The *Ferrell* document, read as a whole, did not alert the prospective releasor of the effect of signing the instrument. (*Ibid.*)

Everyone agrees that drafting a legally valid release is no easy task. Courts have criticized and struck down releases if the language is oversimplified, if a key word is noted in the title but not the text, and if the release is too lengthy or too general, to name a few deficiencies. (See *National & Internat. Brotherhood of Street Racers, Inc.* v. *Superior Court* (1989) 215 Cal.App.3d 934, 937-938 [264 Cal.Rptr. 44] [upholding release by professional race car mechanic injured when he started drag race in reverse].) However, we must remember that "[t]o be effective, a release need not achieve perfection . . . . It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence." (*Id.*, at p. 938.)

Indeed, this release is not perfect. Nonetheless, in plain language it expresses that the releasor is aware of the risks and dangers that can occur on any river trip with Whitewater, including the hazards of personal injury, accident and illness. The release then goes on to express the releasor's consent to assume those risks and, "except in the case of gross negligence," to hold Whitewater and its agents harmless from any liability and claims arising out of the trip. Finally, it ends with a statement indicating the releasor's understanding that he or she cannot participate in the trip unless he or she signs and submits the document to Whitewater.

The exculpatory sentence uses "hold harmless" rather than "releasing" language, and creates an exception for gross negligence but does *not* explicitly encompass Whitewater's negligence; nor does the release specifically mention death or drowning. These drafting "imperfections" do not, however, render the release ambiguous.

First, while the *Ferrell* court was concerned about the absence of "releasing" language, we are not in this case. The key sentence here is not as convoluted as that in *Ferrell*, and in our view flows and makes sense. The juxtaposition of the assumption of risk and hold harmless clauses conveys the message that the releasor assumes all risks attendant to the white water rafting trip while excusing Whitewater for any liability arising from the trip,

except for gross negligence.[9] Everything short of gross negligence is covered by the release, and a specific reference to "ordinary" negligence becomes unnecessary. Further, it is unreasonable, given the structure of the sentence and the release as a whole, to fathom any actor besides Whitewater to whom "gross negligence" refers. Finally, knowledge of a particular risk, e.g., death by drowning, is not necessary where there is an express agreement to assume all risks of a particular situation, whether known or unknown to the releasor. (*Coates* v. *Newhall Land & Farming, Inc., supra,* 191 Cal.App.3d at p. 9.) Without question the risk of death by drowning is a risk inherent in white water rafting and apparent to anyone about to embark upon a three-day recreational rafting trip. The release was valid.

### III. CONCLUSION

Decedent expressly assumed the risks that led to his death. The trial court properly concluded Whitewater was entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The judgment is affirmed.

Perley, J., and Reardon, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 21, 1991. Mosk, J., was of the opinion that the petition should be granted.

---

[9] In reality, California does not recognize a distinct cause of action for "gross negligence" independent of a statutory basis. (*Continental Ins. Co.* v. *American Protection Industries* (1987) 197 Cal.App.3d 322, 328-330 [242 Cal.Rptr. 784]; *Ordway* v. *Superior Court* (1988) 198 Cal.App.3d 98, 108, fn. 5 [243 Cal.Rptr. 536].)