[No. G037019. Fourth Dist., Div. Three. Feb. 28, 2007.]

QUEEN VILLAS HOMEOWNERS ASSOCIATION, Plaintiff and Appellant,
v.
TCB PROPERTY MANAGEMENT et al., Defendants and Respondents.

**COUNSEL**

Stuart W. Knight for Plaintiff and Appellant.

Gates, O'Doherty, Gonter & Guy, K. Robert Gonter, Jennifer C. Lyons and Gina Y. Kandarian-Stein for Defendants and Respondents.

**OPINION**

**SILLS, P. J.—**

### I. *Background*

Jacqueline Wilburn was a member of the board of directors of the Queen Villas Homeowners Association in Inglewood. Allegedly (at least according to her) the condominiums suffered a variety of construction defects and Wilburn, thinking she had special skills in the management of plaintiff's construction defect litigation, "agreed to provide extraordinary services" to "facilitate that litigation," including selecting and communicating with counsel, and coordinating the litigation on the association's side. She was paid for her "services" from the association checking account, allegedly with the knowledge and at least tacit agreement of the association's property management company, TCB Property Management, which is the "DBA" of Laura Dawson. The property management company maintained the association's checking account and checkbook.

A dispute has arisen, and is the subject of the instant litigation, however, as to whether Wilburn was *properly* paid or whether the property management company, in control of the checkbook, had a duty to thwart Wilburn's self-dealing or at least blow the whistle on it. According to the complaint filed by the association, TCB Property Management breached at least two of its contractual duties to the association: (1) to require the signature of two board members on all association expense checks; and (2) to furnish a monthly financial report to the board including check registers and expense

statements. The result was, according to the association, Wilburn's de facto embezzlement of about $134,000 of association money.

The property management company brought a summary judgment motion based on (among other things) the indemnity clause in the agreement between it and the association. Actually, we should say "clauses" because if one examines the copy of the contract appended to the complaint (in our record, the second amended complaint), the subject of indemnity is covered in two sections, once as paragraph F under the heading of "Section II—Financial Management"[1] and again in the second paragraph under C in the heading "Section IV—Insurance and Indemnification." Here is the text of section II, paragraph F: "Association agrees to indemnify, defend and hold agent and its employees, Agents, officers, and directors harmless against any and all claims, costs, suits, and damages, including attorneys fees arising out of the performance of this agreement or in connection with the management and operation of the Association, including claims, damages, and liabilities for injuries suffered, or occurrences of death or property damage relating to the property, excluding any claims or liabilities arising out of the sole negligence or willful misconduct of Agent or its employees. The indemnification language set forth above, shall survive the termination of the Agreement."

We should also add that the first paragraph under C in the heading "Section IV—Insurance and Indemnification" contains pretty much the same language, and for some reason it appears as a quotation in the contract, as if it were blocked out from the facts in some published opinion or other source and simply dropped into the contract. Here is that language, including the recognition that it itself is a quotation: " 'In accordance with Civil Code Section 2772, et seq., as it is amended from time to time, the Association hereby agrees to indemnify, hold harmless and defend Agent and its employees, agents, officers and directors against any loss, liability, damage, claim, demand, suit, or course of action [*sic*: probably meant "cause of action"] arising from Agent's performance of its duties and obligations under this Agreement, or when acting upon the express authorization of the Association and its Board of Directors, or when Agent within the course and scope of duties enforces the Association's governing documents against violators. The Association will also defend and hold Agent harmless for any action taken by Agent which is directly or indirectly related [to] this Agreement.' "

---

[1] All caps in original quotations from the agreement have been changed to normal capitalization for reading ease. There are no issues in this case involving size of type where the fact of all capitalization of text might be relevant.

The trial court granted the motion for summary judgment based on the indemnity clause quoted above as paragraph F under section II, also concluding that the property manager's negligence only constituted "passive" negligence, and further that, as pled, the damages sustained by the association were not *solely* the property manager's fault. The association now appeals from the ensuing judgment.

## II. *Discussion*

■ "Indemnification agreements ordinarily relate to third party claims." (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 969 [17 Cal.Rptr.2d 242].) Thus we have no doubt, for example, that if a third party visitor to the Queen Villas complex tripped over a shovel left out by a gardener hired by the management company, and then sued the management company for negligent hiring, the management company would invoke the indemnity—and in that case properly so—for protection against the suit.

Here, however, the management company seeks to conscript the indemnification agreement in this case into a direct, two-party exculpatory clause, as happened in *Rooz v. Kimmel* (1997) 55 Cal.App.4th 573 [64 Cal.Rptr.2d 177].

Because this case deals with a two-party situation where one party asserts that a contract purportedly releases it of all liability to the other, cases involving when classic three-party indemnification clauses may or may not operate in light of an indemnitee's negligence are not relevant. (E.g., *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97]; *Goldman v. Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40 [41 Cal.Rptr. 73, 396 P.2d 377].)

■ In fact, bogging down in the issue of sole versus nonsole or active versus passive negligence only obscures the fact that *this* is a two-party exculpatory clause case. Where a two-party contract purportedly releases one side from liability to the other (e.g., *Saenz v. Whitewater Voyages, Inc.* (1991) 226 Cal.App.3d 758 [276 Cal.Rptr. 672] [contract in which plaintiff's decedent expressly assumed the risk of whitewater rafting and relieved defendant rafting company of liability]), courts must look for clear, unambiguous and explicit language not to hold the released party liable. As the *Saenz* court nicely put it: "Everyone agrees that drafting a legally valid release is no easy task. Courts have criticized and struck down releases if the language is oversimplified, if a key word is noted in the title but not the text, and if the release is too lengthy or too general, to name a few deficiencies. . . . However, we must remember that '[t]o be effective, a release need not achieve perfection . . . . It suffices that a release be clear, unambiguous, and

explicit, and that it express an agreement not to hold the released party liable for negligence.' " (*Id.* at p. 765, citation omitted, quoting *National & Internat. Brotherhood of Street Racers, Inc. v. Superior Court* (1989) 215 Cal.App.3d 934, 938 [264 Cal.Rptr. 44].)

In other words, exculpatory clauses are construed against the released party. (E.g., *Bennett v. United States Cycling Federation* (1987) 193 Cal.App.3d 1485, 1490 [239 Cal.Rptr. 55] [" 'courts have strictly construed the terms of exculpatory clauses against the defendant who is usually the draftsman' "]; *Philippine Airlines, Inc. v. McDonnell Douglas Corp.* (1987) 189 Cal.App.3d 234, 237 [234 Cal.Rptr. 423] [" 'The law generally looks with disfavor on attempts to avoid liability or to secure exemption for one's own negligence . . . . The law requires exculpatory clauses to be strictly construed against the party relying on them.' " (Citation omitted.)]; *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 932 [218 Cal.Rptr. 839] [same]; *Celli v. Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 518–519 [105 Cal.Rptr. 904].)

The property management company cites us to only one case where a party obtained exculpation from an "indemnity" clause, *Rooz v. Kimmel, supra,* 55 Cal.App.4th 573 (*Rooz*). Our own research has turned up no other.[2]

*Rooz,* however, merely illustrates an extreme end of the rule of strict construction: If parties go out of their way and say "we really, really mean it," language clearly contemplating exculpation may be enforced.

While the facts in *Rooz* are a thicket of complications arising out of a "1031 exchange" between the owners of two office buildings, we can sketch them in this paragraph. As part of the exchange the plaintiff was to receive consideration in the form of a deed of trust on yet another building, which we will call the "third building." The plaintiff was a bit cheap, though, and rather than open a formal escrow and purchase title insurance, insuring that his deed of trust would have a guaranteed second position (see *Rooz, supra,* 55 Cal.App.4th at p. 590) on that third building, he asked a title company (which was simultaneously handling the other party's acquisition of that building) to simply record the trust deed on the property when the other party actually acquired it. The title officer explained to the plaintiff that the title company would only record the deed of trust as an "accommodation," and moreover

---

[2] *Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547 [21 Cal.Rptr.3d 322] is not an exculpation or even an indemnity case. It is a scope-of-arbitration-clause case where a party sought to avoid being compelled to arbitration and used, as one of its arguments, the idea that the arbitration clause was merely limited to third party claims because of the proximity of the arbitration clause to the indemnity clause. (See *id.* at p. 555.) The court of course rejected the idea. (*Ibid.*)

required the plaintiff to sign an indemnification agreement which specifically recited the recording of the deed as an accommodation " 'with no title or escrow liability.' " (*Id.* at p. 578.) The indemnity agreement also specifically recited the absence of benefit otherwise derived by the title company, and the reluctance of the title company to " 'carry out' " the recording unless indemnified. (*Id.* at p. 585.)

However, when the other party's escrow on the new building closed, the other party delayed in giving the title company permission to record the deed. In fact, the other party used the period of delay to encumber the third building with another $1.5 million in other loans. That meant that when the plaintiff's deed of trust was eventually recorded, it was already subject to more than $2 million in encumbrances. When the real estate recession of the early 1990's hit, the property was sold, and the plaintiff lost the value of the deed of trust. (*Rooz, supra,* 55 Cal.App.3d at pp. 579–580.)

The plaintiff sued the title company to recover his loss, based on the delay in the "accommodation" recording. That brought the indemnity agreement to the fore. After a bench trial the court absolved the title company of liability based on the indemnity agreement, and the appellate court upheld the judgment. The appellate court noted that "strictly speaking" the indemnity clause was being applied as a release of liability clause. (*Rooz, supra,* 55 Cal.App.4th at p. 582.) Even so, the court upheld that application—and in fact made a point of doing so regardless of whether the title company's negligence was "active" or "passive." (See *id.* at p. 586.) The point was that the "commercial reality of the accommodation recording" showed that the parties *intended* for the indemnity clause to release the defendant title company. (*Ibid.*)

The *Rooz* court gave two reasons for its conclusion that the parties intended exculpation: (1) The title company "made it clear" that the service it was to provide was a " 'favor.' " (*Rooz, supra,* 55 Cal.App.4th at p. 586.) (2) The title company "made it clear" that it would undertake the service "only" if the plaintiff agreed to exonerate it from all liabilities arising (specifically) out of the recording. (*Ibid.*) Under such circumstances the alternative of *not* enforcing the indemnity clause would deprive the title company of the benefit of its bargain. (*Ibid.*)

■ In the case before us, in contrast to *Rooz,* there are no indicia in terms of the "commercial reality" or the "benefit of the bargain" received by defendant that would require a court to interpret the words "indemnify" or "hold harmless" here beyond the usual context of third party indemnification.

In fact, quite the contrary: The contract fixed specific duties regarding the management of the association's checking account upon the management

company for a consideration. The tasks were not being done as a favor. There are no references in the language of the indemnity agreement (in contrast to *Rooz*) to the specific risk associated with the checkbook management services. And the reference in the indemnity agreement to "sole negligence"— and there was no such language in the part of the indemnity agreement quoted in *Rooz* (see *id.* at pp. 585–586)—underscores the purpose of this indemnity agreement as a classic third party indemnity agreement. The "sole negligence" clause points the reader to the fact that there will be, at least in theory, situations where the property management company might *not* be indemnified if it were sued by a third party.

On top of all of this, there is the reductio ad absurdum of the property management company's position vis-à-vis the association's contract claims (as distinct from negligence claims). Under the property management company's interpretation, it could just outright plain fail to do any work at all for the association, such as hiring a gardening company or arranging for insurance or the typical things that property managers do, and the clause would protect it even from a breach of contract action by the association for having paid for services never performed.

That leaves only the property management company's emphasis on the words "hold harmless" as somehow accomplishing the task of exculpation despite any other indicia of intent to exculpate.

In passing, at least two California cases have observed that the words "hold harmless" are synonymous with third party indemnity situations. (See *Building Maintenance Service Co. v. AIL Systems, Inc.* (1997) 55 Cal.App.4th 1014, 1029 [64 Cal.Rptr.2d 353] and *Myers Building Industries, Ltd. v. Interface Technology, Inc., supra*, 13 Cal.App.4th at pp. 968–969.)

The fountainhead of these observations is *Varco-Pruden, Inc. v. Hampshire Constr. Co.* (1975) 50 Cal.App.3d 654 [123 Cal.Rptr. 606]. In *Varco-Pruden* a subcontractor agreed to build a building for a general contractor, and part of their agreement was the general contractor's agreement with the owner that the general contractor would hold the owner " 'free and harmless from any and all losses.' " (*Id.* at p. 660.) The word "indemnify" was *not* part of the agreement. (See *id.* at pp. 659–660.)

When a fire broke out during construction, various amounts to compensate for the expenses incurred by the general contractor were deducted from the amount the general contractor paid the subcontractor, and the subcontractor sued for the difference. The general contractor asserted the "free and harmless" language as a defense and obtained summary judgment. In reversing the summary judgment and concluding that the clause did not impose any

liability on the plaintiff subcontractor, the appellate court reasoned that the clause only applied "to claims made by third parties." (*Varco-Pruden, Inc. v. Hampshire Constr. Co., supra,* 50 Cal.App.3d at p. 660, relying on *Dixie Container Corp. v. Dale* (1968) 273 N.C. 624 [160 S.E.2d 708, 711].)

■ However, neither *Building Maintenance Service Co.* nor *Myers Building Industries* nor *Varco-Pruden* addressed the possible problem of textual surplusage that arises if one treats "hold harmless" as synonymous with "indemnify." When two words are used in a contract, the rule of construction is that the words have different meanings (e.g., *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1785 [22 Cal.Rptr.2d 206] ["In California, however, contracts—even insurance contracts—are construed to avoid rendering terms surplusage."]; but see Civ. Code, § 3537 ["Superfluity does not vitiate."]).

■ Are the words "indemnify" and "hold harmless" synonymous? No. One is offensive and the other is defensive—even though *both* contemplate third party liability situations. "Indemnify" is an offensive right—a sword—allowing an indemnitee to seek indemnification. "Hold harmless" is defensive: The right *not to be bothered* by the other party itself seeking indemnification.

Let us illustrate: As every veteran of construction defect litigation and every judge who ever picked up a hefty construction defect file knows, in third party situations there is usually a blizzard of cross-complaints *seeking* indemnity for the cross-complainant's possible liability *for* indemnity. Consider this hypothetical: Homeowner sues general contractor. General contractor sues "Subs" 1 and 2 for indemnity, that is, to make both subcontractors cover the general's prospective liability to the homeowner. Now suppose Sub 1 has an agreement with Sub 2 which requires Sub 2 to "indemnify and hold harmless" Sub 1. Sub 1 can use the word "indemnify" in the agreement as a basis *to sue* Sub 2 for indemnity for the possible liability Sub 1 may incur to the general. And Sub 1 can use the phrase "hold harmless" as a basis *to prevent* Sub 2 from suing *it* for the liability that Sub 2 might incur to the general. In other words, "indemnify and hold harmless" can both apply to third party situations *without* violating the canon against surplusage.

Because the indemnity clause here should not be construed in an exculpatory manner, we are spared the need to address the public policy problems that might otherwise be raised if we affirmed. (See Civ. Code, § 1668; *Rooz, supra,* 55 Cal.App.4th at pp. 587–591 [discussing why exculpation in that case did not offend public policy].)

## III.  *Disposition*

The judgment is reversed. The association will recover its costs on appeal.

Moore, J., and Fybel, J., concurred.